Sandi SAMMS and Grace
D. Buck, Appellants,

v.

AUTUMN RUN COMMUNITY
IMPROVEMENT ASSOCI-
ATION, INC., Appellee.

No. 01–99–00349–CV.

Court of Appeals of Texas,
Houston (1st Dist.).

Feb. 17, 2000.

Rehearing Overruled June 9, 2000.

Ronnie Lee Samms, Houston, for Appellant Sandi Samms.

Jeffrey A. Lehmann, Lehmann & Associates, Houston, for Appellant Grace D. Buck.

Marc D. Markel, John Bradley Mitchell, Stephanie L. Quade, Roberts, Markel & Folger, L.L.P., Houston, for Appellee Autumn Run Community Improvement Association, Inc.

Panel consists of Justices O'CONNOR, HEDGES, and PRICE.*

## OPINION

MICHOL O'CONNOR, Justice.

On June 11, 1998, Sandi Samms, the plaintiff below and appellant here, filed suit against Autumn Run Community Improvement Association, Inc., the defendant below and appellee here. Grace Buck, the intervenor below and appellant here, intervened. Samms and Buck sought declaratory judgments interpreting the Autumn Run Section One deed restrictions to require an amendment before the annual assessment could exceed $144, the rate charged under the original deed restrictions. The parties filed cross-motions for summary judgment, and the trial court granted summary judgment in favor of Autumn Run. On appeal, Samms and Buck, in two points of error, claim the trial court erroneously granted summary judg-

ment because Autumn Run did not show the deed restrictions could be amended by the affirmative defense of ratification; and the court should have granted Samms' and Buck's motions for partial summary judgment.

### Facts

Autumn Run is a subdivision located in Katy, Texas. The subdivision is divided into three "sections." On January 18, 1978, deed restrictions for "Autumn Run Section One" were recorded in the real property records of Harris County, Texas. Article VI, paragraph 2 states:

> Each lot in said Subdivision is hereby subjected to an annual maintenance charge and assessment not to exceed $12 per month or $144 per annum, for the purpose of creating a fund to be designated and known as the "maintenance fund", which maintenance charge and assessment will be paid by the Owner or Owners of each Lot within said Subdivision, and any annexed areas, to the Autumn Run Community Improvement Association, in advance in quarterly or annual installments, commencing as to all lots on the first day of the month following the conveyance of the third lot to a homeowner. The rate at which each lot will be assessed, and whether such assessment rate shall be payable quarterly or annually, will be determined annually by the Board of Directors of the Autumn Run Community Improvement Association at least thirty (30) days in advance of each annual assessment. Said rate and when same is payable may be adjusted from year to year by said Board of Directors as the needs of the Subdivision may in the judgement [sic] of the Directors require.

On April 30, 1983, Samms purchased a lot in Autumn Run Section One. On July

* The Honorable Frank C. Price, former Justice, Court of Appeals, First District of Texas    at Houston, participating by assignment.

27, 1983, Buck purchased a nearby lot, also in section one.

The "assessments" cover trash collection, maintenance of common areas, mosquito control, pool management, and electric bills. In 1987, the annual assessment per lot was $192. In the years following, the rate steadily increased to $260 in 1998.[1] To date, the deed restrictions have not been amended.

On July 20, 1997, six homeowners in section one petitioned the board of directors for Autumn Run Section One, demanding that assessment fees immediately be lowered to $144. The homeowners also demanded "a refund of every dollar over $144 for every year we have overpaid our assessment fee, plus ten percent interest." Samms and Buck both signed the petition. In response, the board informed the six concerned property owners that the matter was turned over to Autumn Run's attorney for further research and opinion.

During the next year, the following occurred:

11–13–97: Autumn Run sent out statements for the 1998 annual assessment of $260.

1–28–98: Buck tendered a check for $144 as payment in full.

1–29–98: Samms tendered a check for $144 as payment in full.

2–18–98: Buck received a bill from Autumn Run for $260 and an additional $27.16 in late charges.

2–21–98: Samms received a bill from Autumn Run for $260 and an additional $27.16 in late charges.

3–2–98: Samms resubmitted what she termed the "maximum legal assessment" of $144. Samms also requested evidence of amendments to the deed restrictions if a greater rate was to be charged.

3–9–98: Buck resubmitted $144 because she was advised that was all she owed.

3–20–98: Autumn Run sent Samms and Buck notices of delinquent assessment default.

3–30–98: Samms again requested proof of amendments to the deeds.

4–20–98: Autumn Run responded to Samms and Buck that no amendments had been made. Autumn Run claimed amendments were not necessary because the residents had ratified the assessment increase. The letter inferred that Samms' problem with the assessment rate stemmed from the removal of the board of directors the prior year. Samms' check for $144 was returned as insufficient.

4–29–98: Samms sent a letter to Autumn Run "applauding" the board's decision to consider legally amending the deed restrictions.

5–29–98: Samms and Buck received notices of intent to foreclose.

6–11–98: Samms filed a lawsuit against Autumn Run Community Improvement Association.

6–13–98: Buck intervened in the lawsuit.

### The Lawsuit

In their petitions, Samms and Buck sought declaratory judgments to determine the maximum annual maintenance assessment, unless otherwise amended, as *"not to exceed ... $144 per annum;"* breach of restrictive covenants; and damages for intimidation and harassment, and attorney's fees. Autumn Run filed general denials.

Samms and Buck moved for partial summary judgment, requesting an interlocutory finding that charging in excess of $144 per annum was not in compliance with the deed restrictions. Autumn Run responded that Samms and Buck ratified the change because they had been paying more than $144 since at least 1986. Autumn Run also argued that waiver, estoppel, and laches applied. Samms' and Buck's motions were denied.

---

1. 1987–90: $192; 1991: $220; 1992–94: $250; 1995–98: $260.

Autumn Run filed summary judgment motions against Samms and Buck, asserting that the lot owners in Section One ratified the rate by routinely complying with the assessment charged. The trial court granted Autumn Run's motions.

## Standard of Review

The summary judgment rule provides a method for summarily ending a case that involves only a question of law and no fact issues. Tex.R.App. P. 166a(c); *Nixon v. Mr. Property Management Co.*, 690 S.W.2d 546, 548 (Tex.1985); *Cigna Ins. Co. v. Rubalcada*, 960 S.W.2d 408, 411 (Tex. App.—Houston [1st Dist.] 1998, no pet.). When, as here, both sides move for summary judgment and the trial court grants one motion and denies the other, we review the summary judgment evidence presented by both sides and determine all questions presented. *Commissioners Ct. of Titus Cty. v. Agan*, 940 S.W.2d 77, 81 (Tex.1997); *Rubalcada*, 960 S.W.2d at 411–12. We render such judgment as the trial court should have rendered.

■ Summary judgment is proper only when a movant establishes there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Tex.R. Civ. P. 166a(c); *Randall's Food Mkts., Inc. v. Johnson*, 891 S.W.2d 640, 644 (Tex.1995); *Marchal v. Webb*, 859 S.W.2d 408, 412 (Tex.App.—Houston [1st Dist.] 1993, writ denied). A defendant is entitled to summary judgment if the evidence disproves as a matter of law at least one element of each of the plaintiff's causes of action or it conclusively establishes all elements of an affirmative defense as a matter of law. *Johnson*, 891 S.W.2d at 644. This burden is particularly onerous in the case of ratification because it hinges on the question of intent. *The Atrium v. Kenwin Shops of Crockett, Inc.*, 666 S.W.2d 315, 318 (Tex.App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.).

Once the movant has established a right to a summary judgment, the burden shifts to the nonmovant. *Marchal*, 859 S.W.2d at 412. The nonmovant must respond to the motion for summary judgment and present to the trial court any issues that would preclude summary judgment. *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 (Tex.1979); *Marchal*, 859 S.W.2d at 412.

We cannot consider any ground for reversal that was not expressly presented to the trial court by written motion, answer, or other response to the motion for summary judgment. *Clear Creek Basin Auth.*, 589 S.W.2d at 677; *Hussong v. Schwan's Sales Enter., Inc.*, 896 S.W.2d 320, 323 (Tex.App.—Houston [1st Dist.] 1995, no writ). We will affirm the summary judgment if any of the theories advanced in the defendant's motion for summary judgment are meritorious. *See Cincinnati Life Ins. Co. v. Cates*, 927 S.W.2d 623, 626 (Tex. 1996); *Rubalcada*, 960 S.W.2d at 411.

## Samms' and Buck's Motions for Summary Judgment

■ In their motions for partial summary judgment, Samms and Buck asked the trial court to find that there was no compliance with the deed restrictions or any law that would permit Autumn Run to charge more than $144 for 1998 without first amending the deed restrictions. Samms and Buck claim that, without the amendments, prospective buyers will be misled by the $144 assessment rate that still appears in the deed restrictions. Autumn Run responded that Samms and Buck ratified the assessments.

Samms and Buck claim the only way to amend the deed restrictions is under the terms of Article VIII, section I, of the deed restrictions, which states:

[T]hese covenants are to run with the land and shall be binding upon all parties hereto and all persons claiming under them for a period of forty (40) years from the date these covenants are recorded, after which time said covenants shall be automatically extended for successive periods of ten (10) years, howev-

er, the covenants and restrictions of this Declaration may be amended during the first forty (40) year period by an instrument signed by not less than ninety (90) percent of the lot owners, and thereafter by an instrument signed by not less than seventy-five (75) percent of the lot owners. Any amendment must be recorded in the Official Public Records of Real Property of Harris County, Texas.

Samms and Buck claim this paragraph applies to amending assessments to any rate higher than $144.00; and, therefore, Autumn Run violated the terms of the deed restrictions because it did not file amendments.

Article VI, paragraph 2, of the restrictions specifically addresses assessment adjustments:

> Each lot in said Subdivision is hereby subjected to an annual maintenance charge and assessment not to exceed $12.00 per month or $144.00 per annum, for the purpose of creating a fund to be designated and known as the "maintenance fund." ... *The rate at which each lot will be assessed,* and whether such assessment rate shall be payable quarterly or annually, *will be determined annually by the Board of Directors of the Autumn Run Community Improvement Association* at least thirty (30) days in advance of each annual assessment. *Said rate and when same is payable may be adjusted from year to year by said Board of Directors as the needs of the Subdivision may in the judgement [sic] of the Directors require.*

(Emphasis added).

■ One purpose of deed restrictions is protection of property values. *Cox v. Melson–Fulsom,* 956 S.W.2d 791, 794 (Tex. App.—Austin 1997, no writ). Deed restrictions governing residential property are generally enforceable when their language is clear, they are confined to a lawful purpose, and they are written within

reasonable bounds. *Gunnels v. North Woodland Hills Community Ass'n,* 563 S.W.2d 334, 338 (Tex.App.—Houston [1st Dist.] 1978, no writ).

■ Whether restrictive covenants are ambiguous is a matter of law for the court to decide. *Roman Catholic Diocese of Galveston–Houston v. First Colony Community Serv. Assoc., Inc.,* 881 S.W.2d 161, 163 (Tex.App.—Houston [1st Dist.] 1994, writ denied). If there is no ambiguity in the restrictions, the court must decide their intent from the language used in the document. *Silver Spur Addition Homeowners v. Clarksville Seniors Apts.,* 848 S.W.2d 772, 774 (Tex.App.—Texarkana 1993, writ denied). We agree with both parties, that, because the deed restrictions can be given certain legal meaning, they are not ambiguous.

■ Restrictive covenants must be liberally construed to give effect to their purpose and intent. Tex. Prop.Code § 202.003; *Boudreaux Civic Ass'n v. Cox,* 882 S.W.2d 543, 547 (Tex.App.—Houston [1st Dist.] 1994, no writ). Deed restrictions subjecting property to maintenance fees, liens securing a maintenance fee, and a method for amending restrictions are to be liberally construed, giving effect to the intent and purposes of the restrictions. *Cox,* 882 S.W.2d at 547.

We find that Article VI, paragraph 2, of the deed restrictions unambiguously gives Autumn Run the right to change the annual assessments every year as it sees fit. Article VIII covers general amendments to articles that do not specify an amendment procedure within the article to be amended.[2] Article VI not only creates the assessment fee, but specifies the amendment procedure for the assessment fee rate.

Samms and Buck claim that, without the amendments, prospective buyers will be misled by the $144 assessment fee rate that still appears in the deed restrictions. However, if one reads the entire para-

---

**2.** The title of Article VIII is "General Provisions."

graph 2 of Article VI, it is evident that the board has the right to change the assessment rate from year to year. Under our interpretation that the assessment rate is governed wholly by Article VI, while Article VIII covers "general" amendments, purpose and intent is given to both articles.

Samms and Buck purchased their property subject to an annual maintenance assessment, and a method for amending the assessment rate. Because restrictive covenants such as these are to be liberally construed, giving effect to the intent and purposes of the restrictions, we find the board was within the bounds of the restrictive covenant in annually adjusting the assessment without recording the amendment. As a result, Samms and Buck cannot complain of Autumn Run's actions. The trial court did not err in denying Samms' and Buck's motions for summary judgment.

## Autumn Run's Motions for Summary Judgment

We must determine whether Autumn Run established the affirmative defense of ratification. Ratification occurs when a person who knows all the material facts confirms or adopts a prior act that did not then legally bind him and which he could have repudiated. *K.B. v. N.B.*, 811 S.W.2d 634, 638 (Tex.App.—San Antonio 1991, writ denied). The elements of the affirmative defense of ratification are: (1) approval by act, word, or conduct; (2) with full knowledge of the facts of the earlier act; and (3) with the intention of giving validity to the earlier act. *Motel Enterprises, Inc. v. Nobani*, 784 S.W.2d 545, 547 (Tex.App.—Houston [1st Dist.] 1990, no writ).

Because we find that Autumn Run acted within the bounds of the deed restrictions, and Samms and Buck were never in a position to repudiate Autumn Run's ac-

tions, Autumn Run was never in a position to ratify.[3] Therefore, ratification was an improper basis for summary judgment. We reverse the trial court's granting of summary judgment in favor of Autumn Run.

## Remaining Causes of Action

Samms and Buck sued Autumn Run on three causes of action: (1) declaratory judgment interpreting the deed restrictions; (2) breach of the deed restrictions; and (3) intimidation and harassment. This appeal, interpreting the deed restrictions, resolves the first two issues in the underlying lawsuit. The only remaining issue in this lawsuit is the intimidation and harassment claim which was not presented at summary judgment.

## Conclusion

We reverse the trial court's judgment granting Autumn Run's summary judgment based on ratification, and remand the cause to the trial court for further proceedings.

---

**3.** In *Motel Enterprises,* we described ratification as "where a party retains the benefits of an *invalid* contract with full knowledge of the

facts that make the contract *voidable*." 784 S.W.2d at 547 (emphasis added).