Geneva BROOKS, et al, Petitioners,

v.

NORTHGLEN ASSOCIATION,
Respondent.

No. 02–0492.

Supreme Court of Texas.

Argued Sept. 3, 2003.

Decided June 25, 2004.

Rehearing Denied Sept. 3, 2004.

**160**

Sue Auclair, Houston, TX, pro se.

David Alfred Kahne, Law Office of David A. Kahne, Robin Rankin Willis, P.C., Houston, for Petitioner.

John Bradley Mitchell, Clayton Rowland Hearn, Marc D. Markel, Stephanie Lee Quade, Roberts Markel Guerry, P.C., Houston, for Respondent.

Justice JEFFERSON delivered the opinion of the court.

This is a declaratory judgment action involving eight property owners' challenge to their homeowners association's attempt to increase and accumulate annual assessments and impose late fees. The trial court held that chapter 204 of the Texas Property Code[1] authorized the Board to raise assessments unilaterally. The court of appeals affirmed the trial court's judgment in part and reversed in part. Both parties petitioned this Court for review. We granted the petitions to review the interplay between Texas Property Code chapter 204 and Northglen Association's deed restrictions. We affirm the court of appeals' judgment in part, vacate in part, and reverse and render judgment in part.

## I

### Background

Northglen Association ("Northglen") is the homeowners association for six Harris County subdivisions or "sections" encompassing more than 1600 single-family residences. Each section is governed by a separate set of deed restrictions through which every property owner is a member of the Association. The restrictions subject each homeowner to an annual assessment that is deposited into a maintenance fund for such services as maintaining common areas, contracting for garbage disposal, and constructing parks.

---

1. Chapter 204 applies to residential real estate subdivisions in a county with a population of 2.8 million or more. Tex. Prop.Code § 204.002. According to the 2000 U.S. Census, of the 254 counties in Texas, only Harris County comes within the chapter's purview. 2000 United States Census, available at http://quickfacts.census.gov/qfd/states/48/48201.html.

In 1994, Northglen's Board of Directors amended the deed restrictions to expand the Board and to assess late fees on unpaid assessments. Geneva Brooks and other Northglen property owners ("Brooks") organized a committee, called the Committee to Remove the Board, to remove certain Board members who, they complained, acted outside the bounds of the deed restrictions by adopting the amendments. Northglen responded by suing for injunctive and declaratory relief. Northglen sought an order enjoining the eight homeowners from conveying the false impression that Brooks's committee was formed pursuant to Northglen's bylaws and from other conduct designed to disrupt the Board's activities. Northglen also sought a judgment declaring that its actions in electing the Board and assessing late fees were valid exercises of its authority. Brooks counterclaimed for a declaratory judgment that Northglen had no authority to raise assessments or charge late fees without a vote of the property owners. Northglen eventually nonsuited its claims, and the case proceeded on Brooks's declaratory judgment action.

The trial court granted summary judgment for Northglen, declaring that, without a vote of the homeowners, Northglen had the authority to: (1) raise the assessment for Sections One, Two, and Three; (2) raise the assessment for Sections Four, Five, and Six by ten percent each year or accumulate and assess the increase after a number of years; and (3) charge delinquent homeowners a $35 late fee. Finding that both parties had pursued legitimate interests, the trial court elected not to award attorney's fees.

The court of appeals affirmed the trial court's judgment in part and reversed in part. 76 S.W.3d 162, 176. It reversed as to Sections One, Two, and Three, holding that the deed restrictions did not permit annual assessments exceeding $120. As to Sections Four, Five, and Six, the court of appeals held that because the deed restrictions contained no language expressly forbidding accumulation, Northglen could accumulate previous assessments under Property Code section 204.010(16). *Id.* at 167. The court also held that section 204.010(10) gave Northglen the right to assess a $35 late fee in addition to the interest charge permitted by the deed restrictions. *Id.* at 174. Because the property owners did not have prior notice of the late fee, the court of appeals held that Northglen could not foreclose on any homesteads to collect those fees. *Id.* at 175. The court of appeals affirmed the trial court's denial of attorney's fees. *Id.* at 176.

We hold that Northglen cannot accumulate unassessed fee increases because the language in the deed restrictions prevails over chapter 204, and we reverse that portion of the court of appeals' judgment. We affirm the portion of the court of appeals' judgment restricting increases in assessments to $120 and holding that Northglen has the authority to assess late charges for unpaid fees, in addition to the interest charges described in the deed restrictions. We conclude, however, that Northglen may not foreclose on the property if late charges are not paid. Finally, we affirm the court of appeals' judgment regarding attorney's fees.

## II

### Jurisdiction

We first consider Northglen's contention that the trial court lacked subject matter jurisdiction because Brooks did not join all Northglen property owners as parties. Northglen argues that Brooks was required to join all property owners in each affected section before the trial court could render a declaratory judgment and, alter-

natively, that the trial court was without jurisdiction to render a declaratory judgment interpreting the deed restrictions for Sections Three and Six because property owners from those sections were not represented in the lawsuit.

■ We do not have the benefit of the lower courts' views on jurisdiction because Northglen did not raise the issue either in the trial court or the court of appeals. Northglen contends that the doctrine of fundamental error excuses it from "the usual requirements of preservation of the error or briefing of the ... argument" because the absence of jurisdiction may be raised for the first time on appeal. We disagree that the absence of parties within the represented sections deprived the court of jurisdiction and therefore reject Northglen's contention as to Sections One, Two, Four and Five; however, because no property owners in Sections Three or Six were joined in the suit, we agree with Northglen that any judgment affecting those sections would be advisory.

**A**

■ No one disputes that the trial court had jurisdiction to declare the "rights, status, and other legal relations" for the named homeowners, who are "interested under a deed, ... written contract, or other writings constituting a contract or whose rights, status, or other legal relations are affected by a statute...." Tex. Civ. Prac. & Rem.Code §§ 37.003(a) and 37.004(a). The question, then, is not "whether jurisdiction is lacking," as Northglen asserts, but whether the trial court should have refused to enter a judgment when a subset of the homeowners was not joined in the lawsuit. *See Cooper v. Tex. Gulf Indus., Inc.,* 513 S.W.2d 200, 204 (Tex.1974) ("[the] concern is less that of the jurisdiction of a court to proceed and is more a question of whether the court

ought to proceed with those who are present"). To answer that prudential question, we turn to Rule 39, which governs joinder of persons under the Declaratory Judgment Act. Tex.R. Civ. P. 39; *Clear Lake City Water Auth. v. Clear Lake Util.,* 549 S.W.2d 385, 390 (Tex.1977) (applying Rule 39 to actions under the Declaratory Judgment Act).

Rule 39, like the Declaratory Judgment Act, mandates joinder of persons whose interests would be affected by the judgment. *See* Tex. Civ. Prac. & Rem.Code § 37.006 ("When declaratory relief is sought, *all persons who have or claim any interest that would be affected by the declaration must be made parties.*") (emphasis added); Tex.R. Civ. P. 39(a) ("A person who is subject to service of process *shall be joined as a party* in the action if ... he claims an interest relating to the subject of the action ....") (emphasis added). Rule 39 determines whether a trial court has authority to proceed without joining a person whose presence in the litigation is made mandatory by the Declaratory Judgment Act. *Clear Lake City Water Auth.,* 549 S.W.2d at 390.

Rule 39(a)(1) requires the presence of all persons who have an interest in the litigation so that any relief awarded will effectively and completely adjudicate the dispute. In this case, nothing in the rule precluded the trial court from rendering complete relief among Northglen and the eight homeowners who had sued for a declaration of rights. Although the parties continue to litigate its correctness, the trial court's judgment represents a final and complete adjudication of the dispute for the parties who were before the court. *See Caldwell v. Callender Lake Prop. Owners Improvement Ass'n,* 888 S.W.2d 903, 907 (Tex.App.-Texarkana 1994, writ denied). Rule 39(a)(2) relates to situations in which the absent party:

[C]laims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest.

Tex.R. Civ. P. 39.

Section 37.006(a) of the Declaratory Judgment Act, which provides that a trial court's declaration does not prejudice the rights of any person not a party to the proceeding, dispenses with the first of these concerns. *See* Tex. Civ. Prac. & Rem.Code § 37.006(a). Any non-joined homeowner would be entitled to pursue individual claims contesting Northglen's authority to raise assessments or impose fees, notwithstanding the trial court's judgment in the current case.[2] *See Cooper*, 513 S.W.2d at 204 ("[I]t would be rare indeed if there were a person whose presence was so indispensable in the sense that his absence deprives a court of jurisdiction . . .").

We appreciate the risk that, unless each homeowner is joined in one suit, Northglen may be subject to inconsistent judgments. Tex.R. Civ. P. 39(a)(2)(ii). Northglen's dilemma, however, is the product of its own inaction. Northglen could have sought relief at trial by urging the court, among other things, to abate the case, join absent homeowners, or grant special exceptions. *See, e.g., Pirtle v. Gregory*, 629 S.W.2d 919, 920 (Tex.1982); *Dahl v. Hartman*, 14 S.W.3d 434, 436 (Tex.App.-Houston [14th Dist.] 2000, pet. denied); *Adams v. Owens*, 519 S.W.2d 260, 261 (Tex.Civ.App.-Beaumont 1975, writ ref'd n.r.e.); *Pan Am.*

*Petroleum Corp. v. Vines*, 459 S.W.2d 911, 912 (Tex.Civ.App.1970, writ ref'd n.r.e.); *Texaco, Inc. v. Lettermann*, 343 S.W.2d 726, 733 (Tex.Civ.App.-Amarillo, 1961, writ ref'd n.r.e.). Instead, it waited until the case reached this Court to first raise the specter of multiple or inconsistent judgments.

■ Northglen counters that the doctrine of fundamental error excuses its failure to preserve error. However, when Rule 39 was amended, a young law professor remarked:

Henceforth, it will be rare indeed when an appellate court properly determines that the trial court lacked jurisdiction to adjudicate a dispute when the nonjoining person's absence is raised for the first time on appeal by one of the parties in the trial court, at least insofar as the judgment affects parties who participated in the trial, directly or indirectly, or who purposely bypassed the proceedings. The doctrine of fundamental error should no longer protect persons from the binding force of judgments when they have had an opportunity to raise the absence of the nonjoined person and waived it.

*William V. Dorsaneo, III, Compulsory Joinder of Parties in Texas*, 14 Hous. L.Rev. 345, 369 (1977). We conclude that Northglen "had an opportunity to raise the absence of the nonjoined person and waived it." *Id.*; Tex.R.App. P. 33.1.

**B**

■ Sections Three and Six present a different question — does a trial court have jurisdiction to declare the rights of parties who are not before the court? A declaratory judgment requires a justiciable

---

2. Despite the notoriety this dispute engendered in the neighborhood, the record does not disclose that any other homeowners filed suit or were otherwise disposed to contest Northglen's actions.

controversy as to the rights and status of parties actually before the court for adjudication, and the declaration sought must actually resolve the controversy. *See, e.g., The M.D. Anderson Cancer Ctr. v. Novak,* 52 S.W.3d 704, 708 (Tex.2001); *Texas Workers' Comp. Comm'n v. Garcia,* 893 S.W.2d 504, 517–18 (Tex.1995). A judicial decision reached without a case or controversy is an advisory opinion, which is barred by the separation of powers provision of the Texas Constitution. Tex. Const. art. II, § 1; *see Southwestern Elec. Power Co. v. Grant,* 73 S.W.3d 211 (Tex.2002); *Texas Ass'n of Bus. v. Tex. Air Control Bd.,* 852 S.W.2d 440, 444 (Tex. 1993). We must decide, then, whether there is a case or controversy with respect to these sections.

Because there are no "plaintiffs" from Sections Three and Six, there is no person in those sections for whom rights could be declared in this declaratory judgment action. As a consequence, the trial court was without jurisdiction to issue a judgment with respect to those sections, and any opinion interpreting those sections would be purely advisory. Accordingly, we vacate those portions of the lower courts' judgments relating to Sections Three and Six and dismiss those claims for want of jurisdiction.

Having resolved Northglen's appellate pleas to the jurisdiction, we reach the merits for Sections One, Two, Four and Five.

## III

### Sections One and Two

■ We first decide whether the deed restrictions for Sections One and Two, which are identical, allow Northglen to assess additional maintenance fees above the restrictive covenant's express limitation. The restrictions provide:

Each Lot in said Subdivision, when said Lot is certified by the Subdivision Engineer to be a completed building site, is hereby subjected to an annual maintenance charge and assessment not to exceed $10 per month or $120 per annum, for the purpose of creating a fund to be designated and and [sic] known as the "maintenance fund", [sic] which maintenance charge and assessment will be paid by the Owner or Owners of each Lot within said Subdivision, and any annexed areas, to Northglen Association in advance annually, commencing as to all Lots on the first day of the month following their certification of completion. The rate at which each Lot will be assessed will be determined annually by the Board of Directors of Northglen Association at least thirty (30) days in advance of each annual assessment. Said rate and when same is payable may be adjusted from year to year by said Board of Directors as the needs of the Subdivision may in the judgment of the Directors require.

The restrictions also outline requirements for amendment. Article VIII provides that "... the covenants and restrictions of this Declaration may be amended during the first forty (40) year period by an instrument signed by not less than ninety percent (90%) of the Lot Owners, and thereafter by an instrument signed by not less than seventy-five percent (75%) of the Lot Owners." Therefore, a small number of homeowners may exert enormous influence on the extent to which amendments will be adopted.[3]

---

**3.** A similar, though less onerous, supermajority is required to charge a special assessment in a given year. The restrictions provide that Northglen may:

[l]evy, in any assessment year, a special assessment applicable to that year only for the purpose of defraying, in whole or in part, the cost of any acquisition, construc-

Although there are practical hurdles to persuading seventy-five or ninety percent of homeowners to modify the restrictions or agree to an additional assessment, it is clear that the restrictions provide a mechanism by which Northglen can assess an annual fee greater than $120. The court of appeals agreed, holding that because the deed restriction provided that the annual assessments were "not to exceed" $10 per month or $120 per annum, Northglen did not have the authority to exceed the stated limits without first obtaining the homeowners' consent in accordance with the restrictions. 76 S.W.3d at 174.

Northglen disputes this holding, arguing that the deed restrictions should be read in three steps. First, the restrictions create a maintenance fund, for which the assessment shall not exceed $10 per month or $120 per annum. Second, when the maintenance fund is created, the Board of Directors has discretion to determine the rate at which each lot will be assessed above the $120. Third, the assessment rate and date payable may be adjusted from year to year, as the needs of the subdivision require.

In support of its argument, Northglen cites *Samms v. Autumn Run Cmty. Improvement Ass'n.* 23 S.W.3d 398 (Tex.App.-Houston [1st Dist.] 2000, pet. denied). The *Samms* court held that a deed restriction with language similar to Section One and Two granted the homeowners association the authority, from year to year, to determine the rate at which property owners would be assessed. *Id.* at 402. The court held that the homeowners association had authority to raise the assessment without limitation because a phrase in the deed restriction said "the rate at which each Lot will be assessed . . . will be deter-

mined annually by the Board of Directors. . . ." *Id.* But the court did not discuss another provision of that deed restriction which stated explicitly that the assessment was "not to exceed" a particular amount.

The Northglen deed restrictions subject each property owner to "an annual maintenance charge *and assessment* not to exceed $10 per month or $120 per annum, for the purpose of creating . . . the 'maintenance fund'. . . ." (Emphasis added.) The restrictions further provide that "[t]he rate at which each Lot will be assessed will be determined annually" by Northglen, and that "[s]aid rate and when same is payable may be adjusted from year to year by [Northglen] as the needs of the Subdivision may in the judgment of [Northglen] require."

Northglen's argument does not survive the restrictions' plain language. First, the annual assessment is *not to exceed* $10 per month or $120 per year. The restrictions do not *require* that Northglen charge the maximum amount. Rather, Northglen may charge any amount so long as the amount does not exceed $120 per year. So, if Northglen had been assessing $50 per year and decided the next year that $120 was necessary, it has the authority to raise the rates unilaterally. Second, the deed restrictions neither contemplate nor permit an additional assessment once the maintenance fund is whole because the language says plainly that the assessment is not to exceed $10 per month or $120 per year. There is no language permitting an additional assessment beyond that which is included in the maintenance fund, aside from the special assessment for capital improvements.

tion, reconstruction, repair or replacement of a capital improvement . . . *provided that* any such assessment shall have the assent

of two-thirds (2/3rds) of the votes of each class of members. . . .
(Emphasis in original.)

We hold that the court of appeals correctly concluded that Northglen cannot increase assessments beyond the $120 limitation set forth in the deed restrictions, and we affirm that part of the court of appeals' judgment.

## IV

### Sections Four and Five

■ Northglen argues — and the court of appeals held — that the deed restrictions permit accumulation of unassessed increases in maintenance fees for Sections Four and Five. 76 S.W.3d at 167. Northglen contends, specifically, that Property Code section 204.010 allows it to accumulate and assess a $430 single-year increase — raising the assessment from $120 to $550. That section provides:

§ 204.010. Powers of Property Owners' Association

(a) Unless otherwise provided by the restrictions or the association's articles of incorporation or bylaws, the property owners' association, acting through its board of directors or trustees, may:

. . .

(16) if the restrictions allow for an annual increase in the maximum regular assessment without a vote of the membership, assess the increase annually or accumulate and assess the increase after a number of years.

Tex. Prop.Code § 204.010.

The property owners counter that the trial court properly interpreted Sections Four and Five as to allowable increases. They argue that by limiting the annual assessment increase to ten percent, the deed restrictions "otherwise provide" that accumulation is not permitted. We examine the competing contentions first by analyzing the deed restrictions and then by determining the extent to which they are affected by the Property Code.

### A

Determining whether the statute applies requires an understanding of the deed restrictions. The deed restrictions for Section Four provide:

Until January 1 of the year immediately following the conveyance of the first Lot to an Owner, the maximum annual assessment shall not exceed Ten ($10.00) Dollars per month, or One Hundred Twenty ($120.00) Dollars per annum, per lot; provided, however, that from and after January 1 immediately following the conveyance of the first Lot to an Owner, the Board of Directors of the Association shall be empowered to increase said rate as the needs of the Association require; except that **if any such increase shall cause the annual assessment to be greater than the aforesaid $120.00 plus the rise, if any, of the Consumer Price Index as published by the United States Department of Labor for the preceding month of July; or more than One Hundred Ten (110%) percent of the amount assessed in the preceding calendar year, whichever is greater, then shall such an increase require the vote of two-thirds (2/3) of each class** of Members of the Association who are voting in person or by proxy, at a meeting duly called for that purpose.

(Emphasis added.)

Section Four thus permits an increase of ten percent more than the previous year's assessment, and a greater increase if the Consumer Price Index is higher. The restriction requires a vote of the homeowners to raise the assessment beyond those amounts.

The restrictions for Section Five are similar to Section Four:

Until January 1 of the year immediately following the date of commencement of the first annual assessment as determined by the Board of Directors, the maximum annual assessment shall be $120.00 per Lot. From and after the first day of January of the year immediately following the date of commencement of the first annual assessment, the maximum annual assessment may be increased by the Board of Directors of the Association, effective the first day of January of each year, in conformance with the rise, if any, in the *Consumer Price Index for Urban Wage Earners and Clerical Workers* published by the Department of Labor, Washington, D.C., or any successor publication, for the preceding month of July or alternatively, **by an amount equal to a ten percent (10%) increase over the prior years [sic] annual assessment,** whichever is greater, without a vote of the Members of the Association. The maximum annual assessment may be increased above that established by the Consumer Price Index formula or the above-mentioned percentage increase only by approval of two-thirds (2/3rds) of each class of Members in the Association present and voting at a meeting duly called for this purpose. In lieu of notice and a meeting of Members as provided by the By-Laws of the Association, a door to door canvass may be used to secure the written approval of two-thirds (2/3rds) of each class of Members for such increase in the annual assessment or in the special assessment for capital improvements as provided.... After consideration of current maintenance costs and future needs of the Association, the Board of Directors may fix the annual assessment at an amount not in excess of the maximum amount approved by the Members.

(Emphasis added.)

Both Sections Four and Five maintain an initial $120 per annum limit on assess-ments, followed by discretionary increases of up to ten percent or the rise in the Consumer Price Index, whichever is greater. Those increases are tied to the previous year's assessment.

## B

We now consider how the Texas Property Code applies to the preceding deed restrictions. One of the stated purposes in chapter 204 is to provide a mechanism "to readily facilitate increases in the amount of the regular or special assessments to allow the property owners' associations to better provide services to the subdivisions." Tex. Prop.Code § 204.001 historical note, [Act of May 27, 1995, 74th Leg., R.S., ch. 1040, § 1, 1995 Tex. Gen. Laws 5170, 5171]. The Legislature observed that severe restrictions on the ability to adjust regular assessments "may result in the inability of an ineffective property owners' association to maintain common area facilities, including swimming pools, tennis courts, clubhouses, greenbelt areas, or jogging trails, or to provide services, including streetlights, security, architectural control, and deed restriction enforcement." *Id.* Read in isolation, the legislature's preamble to section 204 offers some support for Northglen's argument that it has the authority to accumulate previously unassessed fee increases beyond the maximum stated in the restrictions to maintain common facilities or to provide services. The Legislature, however, inserted a caveat that governs here: the statutory provision permitting accumulation does not apply if the deed restrictions "otherwise provide." Tex. Prop.Code § 204.010.

In this case, the Northglen deed restrictions for Sections Four and Five "otherwise provide" that accumulation is not permitted. Section Four limits the ten

percent increase to "the amount assessed in the *preceding* calendar year." (Emphasis added.) Section Five also limits the "increase over the *prior years* [sic] annual assessment." (Emphasis added.) The natural consequence of each restriction's language is that if the annual assessment for this year is $120, then next year's assessment may not be raised to the $550 that Northglen seeks. Rather, next year's assessment may be no more than $132. By specifically tying any increase to the previous year's annual assessment, the deed restrictions do not permit accumulation over multiple years.

Additionally, in Section Four, Northglen may increase fees beyond the limits by receiving a "vote of two-thirds (2/3) of each class of Members of the Association who are voting in person or by proxy, at a meeting duly called for that purpose." In Section Five the Board must receive "approval of two-thirds (2/3rds) of each class of Members in the Association present and voting at a meeting duly called for this purpose." Although a two-thirds vote may be difficult to achieve, the deed restrictions offer Northglen a procedure for increasing fee assessments beyond the ten-percent limit other than accumulation. The voting mechanism, combined with the increase being tied to the previous year's assessment, establishes that the deed restrictions "otherwise provide."

Because we conclude that the statute does not permit accumulation or fee increases above the deed restrictions, we need not address Brooks's contention that the statute's accumulation provisions are unconstitutional.

## V

### Late Fees

We next consider whether section 204.010(a)(10) authorized Northglen to im-pose a $35 late charge, in addition to the interest charge included in the deed restrictions, for failure to pay the annual assessments, and if so, whether such a construction violates the Contract Clause of the U.S. or Texas Constitution. The trial court held that Northglen could charge a late fee under section 204.010(a)(10), and the court of appeals affirmed. Both courts noted that the deed restrictions did not expressly prohibit late fees nor limit penalties to the interest charge. We hold that Northglen may charge a $35 late fee and that such a charge is constitutional.

### A

■ The homeowners argue that permitting Northglen to unilaterally assess late charges would defeat the purpose of the deed restrictions, which already impose a six percent interest charge for non-payment. Additionally, the homeowners argue that by expressly including the interest charge in the restrictions, the homeowners necessarily rejected late charges, under the doctrine of *expressio unius est exclusio alterius* (to include one thing implies the exclusion of the other). Black's Law Dictionary 602 (7th ed.1999).

The court of appeals disagreed with the homeowners' argument and held that Northglen could assess late charges. The court considered the language of section 204.010(a)(10), which provides, in pertinent part:

(a) Unless otherwise provided by the restrictions or the association's articles of incorporation or bylaws, the property owners' association, acting through its board of directors or trustees, may:

. . .

(10) impose interest, late charges, and, if applicable, returned check charges for

late payments of regular assessments or special assessments.

Tex. Prop.Code § 204.010(a)(10). The court held that this statutory language granted Northglen authority to assess the late charge in the absence of specific language to the contrary. Because the deed restrictions do not mention late charges specifically, the court held that silence could not mean "otherwise provide." 76 S.W.3d at 174.

We agree that nothing in the Northglen deed restrictions could be considered "otherwise providing." Each deed restriction contains the same provision for failing to pay assessments:

> *Effect of Non-payment of Assessments: Remedies of the Association.* Any assessment not paid within thirty (30) days after the due date shall bear interest from the due date at the rate of six percent (6%) per annum. The Association may bring an action at law against the Owner personally obligated to pay the same, or foreclose the lien against the property. No Owner may waive or otherwise escape liability for the assessments provided for herein by non-use of any Common Area or abandonment of his Lot.

Contrary to Brooks's argument, the deed restrictions do not say the penalties are the exclusive remedies for late payments, nor do they say that late charges are not permitted. The deed restrictions only set the rate at which Northglen may charge interest on unpaid assessments.

▆▆▆ When construing a statute, the Court must presume that every word of the legislation has meaning. *Riverside Nat'l Bank v. Lewis,* 603 S.W.2d 169, 173 (Tex.1980). The statute unequivocally says the Board may impose both interest charges and late charges. That the deed restriction mentions interest charges but not late charges is not sufficient to "otherwise provide."

### B

Brooks argues that the assessment of a late fee would violate the U.S.[4] and Texas[5] Constitutions' impairment-of-contracts provisions because the deed restrictions do not provide for late fees. The court of appeals examined the constitutionality of the statute and held that Section 204.010 "is not directed to any specific kind of contracts, and it does not directly contradict any contractual provision...." 76 S.W.3d at 168. The court further noted that the statute is a permissible exercise of the State's police power because "it was enacted to promote the public welfare with regard to the property owners associations' ability to better provide services to the homeowners, maintain the common area facilities, and provide for the common security and restriction enforcement." *Id.* at 168–69. We agree and hold that the same rationale applies to the late fees imposed pursuant to chapter 204.

▆▆▆ A statute is presumptively constitutional. *Barshop v. Medina Cty. Underground Water Conservation Dist.,* 925 S.W.2d 618, 625 (Tex.1996). As such, we are obligated to avoid constitutional problems if possible. *Id.* In this case, we must consider two factors: first, whether the

---

4. "No State shall ... pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contracts...." U.S. Const. art. I, § 10.

5. "No bill of attainder, ex post facto law, retroactive law, or any law impairing the obligation of contracts shall be made." Tex. Const. art. I, § 16.

statute substantially impairs the contract; and second, if so, whether the Legislature acted within its police powers in enacting the legislation. *See Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234, 244–45, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978).

■ Section 204.010 does not substantially impair Northglen's deed restrictions. The statute operates only where the deed restrictions do not "otherwise provide." Tex. Prop.Code § 204.010. It does not serve to withdraw or remove any contractual obligation. If the statute required the assessment of late fees where late fees were expressly prohibited by the deed restrictions, this would likely be a different case. *See Travelers' Ins. Co. v. Marshall,* 124 Tex. 45, 76 S.W.2d 1007 (1934)(discussing statutes that declare a complete moratorium on particular contracts). We are not faced with that circumstance here. Thus, applying the statute to authorize a late fee is not unconstitutional.

## VI

### Foreclosure

■ Because we hold that Northglen may charge late fees for unpaid fee assessments, we must address whether it has the authority to foreclose on the homestead if a property owner fails to pay the late fee. This Court has clarified that Texas' homestead laws authorize a homeowners association to foreclose on homesteads for the nonpayment of fee assessments. *Inwood Homeowners' Ass'n v. Harris,* 736 S.W.2d 632, 635–36 (Tex.1987). In *Inwood,* we considered whether the homestead laws of Texas protect a homeowner against foreclosure for failure to pay homeowners association assessments. *Id.* at 633. As a general rule, a homestead is protected against the debts of those who live in the

homestead. *Id.* at 634. However, the deed restrictions for the subdivision included a vendor's lien permitting foreclosure on the homestead for failure to pay the fee assessment. *Id.* at 633. Because the property owner had notice when purchasing the property that a lien attached to the land, we held that foreclosure was permissible. *Id.* at 635–36.

The court of appeals, in our case, focused on the notice requirement and held that foreclosure was not a potential remedy against unpaid late charges. 76 S.W.3d at 175. The court noted that the lien to enforce the late charges attached to the property after the homestead was acquired because late charges were not included in the deed restriction. *Id.*

The court cited as authority an Attorney General opinion that said costs imposed upon property owners because of Chapter 204, which were not part of the deed restriction, could not be enforced through foreclosure. *Id.* (citing Tex. Att'y Gen. Op. LO–97–019 (1997)). The Attorney General concluded that, in determining whether foreclosure is a remedy, the issue is "whether the lien for those costs (i) attached to the property prior to the homestead right and (ii) is the result of a restriction that runs with the land." Tex. Att'y Gen. Op. LO–97–019. The court of appeals considered the two elements and held that because late charges were not part of the deed restrictions but rather a function of the statute, Northglen could not foreclose for failure to pay late charges. 76 S.W.3d at 175–76.

Northglen argues that a developer has the authority to create liens to ensure the payment of fee assessments, and under *Inwood,* an appropriate remedy for failure to pay assessments is foreclosure. Northglen also contends that because property

owners were aware that delinquent assessments would be subject to late charges, in the form of an interest charge, the property owners had actual notice sufficient to satisfy *Inwood.* Thus, because the property owners had actual notice, Northglen asserts, the late charge should also run with the land as the interest charge does.

We disagree with Northglen and agree with the court of appeals. Northglen's argument essentially amends the deed restrictions to include both late fees and interest charges. But the restrictions did not provide any notice that a late fee would be imposed in addition to the interest charge. As a result, the property owners did not have notice of the late charge. Therefore, in light of *Inwood*'s notice requirement, foreclosure is not an appropriate remedy for a failure to pay the late charge.[6]

reserve the power exclusively to the members. We cannot reach this issue. Northglen did not file a notice of appeal from the trial court's judgment, did not notice a cross-appeal, and did not petition this court for review on the point. Accordingly, Northglen did not preserve this issue for our review. Tex.R.App. P. 25.1(c) ("[A] party who seeks to alter the trial court's judgment or other appealable order must file a notice of appeal.... The appellate court may not grant a party who does not file a notice of appeal more favorable relief than did the trial court except for just cause."), 53.1 ("A party who seeks to alter the court of appeals' judgment must file a petition for review."); *see also Dean v. Lafayette Place (Section One) Council of Co–Owners, Inc.,* 999 S.W.2d 814, 818 (Tex.App.-Houston [1st Dist.] 1999, no pet.).

## VII

### Non-profit Corporation Act

Northglen challenges that portion of the trial court's judgment providing that "the bylaws may only be amended by the members...." Northglen argues that, even absent Property Code chapter 204, it had the authority to increase assessments because it may amend the deed restrictions unilaterally under the Texas Non–Profit Corporation Act. Tex.Rev.Civ. Stat. art. 1396–1.01 *et seq.* That statute provides, among other things, that a board of directors has the authority to amend bylaws unless the articles of incorporation

## VIII

### Attorney's Fees

The final issue is whether the property owners should be awarded attorney's fees. The trial court declined to award attorney fees, finding that "the parties each had legitimate interests to pursue." The court of appeals affirmed, holding that "[i]n the judgment we render, neither side would be considered a prevailing party." 76 S.W.3d at 176. The Declaratory Judgment act permits a court to "award costs and reasonable and necessary attorney's fees as are equitable and just." Tex. Civ. Prac. & Rem.Code §§ 37.009. Although we reverse

---

**6.** We express no opinion on the court of appeals' holding that "any new type of assessment ... or attorney's fee that is imposed solely through the authority of Chapter 204 of the Texas Property Code cannot be enforced by foreclosure against a homestead." 76 S.W.3d at 175. Inasmuch as we have re-

versed the court of appeals' judgment regarding accumulation, we need not decide whether foreclosure would be an appropriate remedy for accumulated assessments. Similarly, attorney's fees imposed through Chapter 204 are not at issue in this case.

part of the court of appeals' judgment, the basis for the trial court's decision for denying fees — that each side pursued legitimate interests — has not changed. Accordingly, we will not disturb the trial court's discretionary decision in that regard. We affirm the court of appeals' judgment on attorney's fees.

## IX

## Conclusion

We (1) affirm the court of appeals' judgment as to the increased assessments in Sections One and Two, the assessment of late fees, and foreclosure; (2) reverse the court of appeals' judgment and render judgment as to accumulation of fee increases under Sections Four and Five; (3) vacate the trial court's and the court of appeals' judgments as to Sections Three and Six and dismiss for want of jurisdiction Brooks's claim as to those sections; and (4) affirm the court of appeals' judgment regarding attorney's fees. Tex. R.App. P. 60.2(a), (c), (e).