Affirmed in Part, Reversed and Remanded in Part, and Opinion filed March
3, 2005









Affirmed
in Part, Reversed and Remanded in Part, and Opinion filed March 3, 2005.

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-03-00142-CV

____________

 

TEXAS FIRST
NATIONAL BANK,
Appellant

 

V.

 

HERBERT NG AND
KENNETH WU,
Appellees

 



 

On Appeal from the 157th
District Court

 Harris County, Texas

Trial Court Cause No. 00-52051

 



 

O P I N I O N

This case involves alleged improprieties
in the handling of one client’s accounts at Texas First National Bank.  TFNB sued its former chairman, Kenneth Wu,
alleging that he breached his fiduciary duty to the bank, and sued its former
senior vice president, Herbert Ng, alleging that he committed fraud and
breached his fiduciary duty.  After a
jury trial on certain issues and a bench trial on others, the trial court
entered judgment that (1) TFNB take nothing on its claims against Wu, (2) Wu is
entitled to indemnification from TFNB, and (3) TFNB is entitled to specified
damages from Ng.








All three parties have appealed.  In his appeal, Ng contends that (1) the
evidence is insufficient to support the jury’s finding that he committed fraud;
(2) the evidence is insufficient to support the finding that he breached his
fiduciary duty; (3) the trial court erred in not applying the ratification
finding to negate the fraud finding; (4) the trial court erred in refusing to
submit a question concerning TFNB’s liability for fraud; and (5) he is entitled
to indemnity from TFNB.  In his appeal,
Wu contends that the evidence is insufficient to support the jury’s finding
that he breached his fiduciary duty.  In
its appeal, TFNB contends that the trial court erred in (1) granting a
take–nothing judgment favoring Wu based on the jury finding that TFNB ratified
Wu’s conduct and (2) awarding indemnification to Wu. 

We affirm the judgment against Ng on
fraud.  Because we find that the evidence
is legally insufficient to sustain the ratification finding, we reverse the
judgment for Wu on the breach of fiduciary duty claim and indemnification and
remand for entry of a new order in accordance with this opinion.  For the sake of cohesion and comprehension, we
will first present a general time line of events.  We will then discuss the liability issues
concerning Ng and Wu, the ratification issues, and the jury charge issue raised
by Ng.

I. 
Time Line

The allegations in this lawsuit all
concern conduct regarding one of TFNB’s customers:  Alyna, Inc., owner of a chain of convenience
stores.  In 1998, TFNB had several
outstanding loans to Alyna, and Alyna had several accounts with TFNB.  Herbert Ng was the loan officer for the Alyna
loans.  By summer 1998, the Alyna loans
and accounts had become problematic: 
loan payments went uncollected and checks deposited by Alyna from its
accounts in other banks were being returned for insufficient funds.

A. 
The Money Orders








In July 1998, Alyna began depositing money
orders in its TFNB accounts.  When Ng
became aware of this practice, he asked Alyna’s owner, Riyaz Nathoo, about
it.  Nathoo told Ng that the money orders
were mistakes:  either returns from
customers or printing errors by the machines. 
According to Nathoo, when a money order was printed at one of Alyna’s
stores, the money order company, FFP, Inc., was electronically notified and
could then automatically take funds from Alyna’s TFNB accounts; in order to
cancel out the automatic draws, the money orders needed to be deposited into
the accounts.  However, it was learned
much later that Alyna was apparently playing the float between the date of
issuance for the money orders and the date of the automatic draw to FFP, which
usually amounted to several days.[1]

Throughout July, money orders poured into
the Alyna accounts, many made out to Alyna or entities affiliated with
Alyna.  There was testimony from several
sources that because of the uncollected status of the Alyna loans, Ng had to
review the daily deposits himself, although Ng denied that he did this or was
supposed to do it.  Regardless, Ng
frequently gave Alyna immediate credit on its deposits (including the money
orders) so that it could pay its bills.

In early August, when Alyna began to have
problems paying for the money orders, someone at FFP contacted Ng, told him
that Alyna was behind in its payments, and requested that he freeze the Alyna
accounts and turn the money over to FFP.[2]  Alyna agreed to give FFP $200,000 in payment
for the money orders, and, on August 5, Ng approved the issuance of a cashier’s
check drawn from Alyna’s accounts.[3]








However, after a teleconference between
Ng, Michael Massey (TFNB’s outside counsel), Greg Kramer (president and CEO),
and David Chung (manager of the bookkeeping department), it was decided to stop
payment on the cashier’s check because FFP had stopped payment on money orders
deposited in Alyna’s accounts.  The
theory, according to Ng, was that TFNB owed a fiduciary duty to pay the
cashier’s check, and FFP had a fiduciary duty to pay the money orders; by
stopping payment on the cashier’s check, it was believed that it would give
TFNB leverage to negotiate with FFP. 
During the decisive teleconference, Ng did not disclose the true nature
of the money orders deposited in Alyna’s account (i.e., that no one had
ever paid for them); in fact, there is no evidence Ng ever told anyone at TFNB
about the true nature of the money orders.[4]

Ultimately, FFP sued TFNB and Alyna,
alleging that Alyna had breached its trust with FFP, and that TFNB had
participated in the breach, had made negligent misrepresentations, and had
unlawfully refused to pay the cashier’s check. 
In 2000, during a deposition related to this prior litigation, Ng
revealed that he knew Alyna had been depositing money orders in its accounts
and gave his claimed understanding that the money orders had to be deposited to
cancel out the automatic draws. 
According to David West, an attorney who represented TFNB in the FFP
lawsuit, Ng’s deposition remarks “cut our throat.”  After a jury trial, judgment was entered
against TFNB for $441,587.71 in actual damages plus pre- and post-judgment
interest and attorney’s fees.[5]

B. 
The Overdrafts








Meanwhile, on August 19, 1999, Kenneth Wu
became chairman of TFNB’s board of directors and chairman of its executive
committee, which acted as a loan committee. 
As will be discussed in detail below, there was considerable testimony
that Wu usurped the authority of TFNB’s president and CEO, Kramer, thus
preventing the latter from effectively supervising Ng.

When FFP ceased honoring money orders
deposited in the Alyna accounts, the accounts became overdrawn.  Ng opened three new accounts for Alyna and
permitted it to regularly overdraft them for significant amounts.  From September 1998 through February 1999,
the Alyna accounts were consistently overdrawn. 
According to Ng, the TFNB “action plan” was to try to keep Alyna’s
convenience stores operating so that they could be sold at a higher value and
the loan balances reduced.  Indeed, at
one point, four of Alyna’s ten stores were sold, and the loan balance was
reduced.  Ng testified that, during this
period of time, he kept in daily contact with Alyna’s owner so he could monitor
the funds coming in and out of the account and grant immediate credits and
overdrafts as required to keep the stores operating.  In doing so, Ng greatly exceeded his official
authority to authorize overdrafts; however, Ng claimed that he had approval
from the board of directors and the executive committee to exceed those
limitations.

The board of directors was informed about
the so-called action plan through inclusion of Alyna’s loans in a monthly Watch
List of troubled loans.  Beginning in
September 1998, the Watch List indicated that the stores were to be kept open
while a buyer was being sought.  The
September Watch List included a notation, made at Ng’s direction, that the
overdraft was “fully covered by a provisional credit under the bank’s
control.”  This notation dropped off the
Watch List in later months, although there remained an indication that the overdrafts
might be recovered through certain offsets (which apparently referred in part
to the hope of settling the FFP lawsuit and regaining a portion of the
cashier’s check).  The board was also
kept apprised of the accounts’ overdraft status both in the Watch List and the
monthly Overdraft Report.  It was hotly
disputed at trial whether by “approving” these reports, the board was simply
approving the preparation of the reports or whether it was actually approving the
“action plan” and the overdrafts.








In February 1999, American First National
Bank discovered that Alyna had been kiting checks between itself and TFNB.[6]  AFNB stopped payment on the outstanding
checks, on which Ng had already granted immediate credit, and the overdraft
amounts soared.  Ultimately, TFNB lost
over $500,000 in unrecovered overdrafts.

C. 
The Lawsuit

TFNB sued Ng and Wu.  Against Ng, TFNB alleged that by making
misrepresentations of fact to his superiors and failing to disclose other
material facts he committed fraud and breached his fiduciary duty.  Ng denied these allegations and contended
that his actions were ratified by his superiors, the board, the executive
committee, and the shareholders.  Against
Wu, TFNB alleged that he used his position as chairman to usurp Kramer’s
authority as CEO and president and to permit Ng to recklessly handle the Alyna
accounts thus resulting in the overdraft losses.[7]  Wu denied these allegations and contended
that his actions were ratified.








The jury found that Ng committed fraud
against TFNB, Ng and Wu both breached their fiduciary duties to TFNB, and the
conduct of both men caused TFNB to incur damages.  The jury found that TFNB ratified the conduct
of both Wu and Ng but did not waive its right to seek damages against either of
them.  The jury further found that two
other TFNB officers also breached their fiduciary duties:  Gregory Kramer, who was TFNB’s CEO and
president, and Tom Tsao, who was chief cashier.[8]  The jury apportioned liability between Ng,
Kramer, and Tsao as follows: 50 percent as to Ng, 20 percent as to Tsao, and 30
percent as to Kramer.[9]

The trial court heard the indemnification
issues.  It found that Ng was not
entitled to indemnification, but concomitantly, Wu was entitled to
indemnification.  In drafting its final
judgment, the trial court apparently determined that the ratification finding
nullified the breach of fiduciary duty findings but did not affect the fraud
finding against Ng.  The court awarded a
take–nothing judgment on TFNB’s claims against Wu; ordered Ng to pay TFNB
$180,022.96 in damages plus pre– and post–judgment interest; and ordered TFNB
to pay Wu $475,705.44 in attorney’s fees and litigation expenses related to
trial, plus additional amounts in the event of appeal to this court or the
Texas Supreme Court, as well as post-judgment interest.[10]

II. 
Liability Against Ng

A. 
Fraud








In his first issue, Ng contends that the
evidence is legally and factually insufficient to support the jury’s finding
that he committed fraud against TFNB.  In
considering these sufficiency challenges, we utilize the normal standards of
review.  See St. Joseph Hosp. v. Wolff, 94 S.W.3d 513, 519–20 (Tex. 2003)
(legal sufficiency); Maritime Overseas Corp. v. Ellis, 971 S.W.2d 402,
406–07 (Tex. 1998) (factual sufficiency). 
Because Ng does not challenge the fraud question on appeal, we consider
the evidence in light of the charge as given. 
Osterberg v. Peca, 12 S.W.3d 31, 55 (Tex. 2000).  In response to Question No. 5, the jury found
Ng committed fraud.[11]  The question contained instructions regarding
both fraudulent nondisclosure and fraudulent misrepresentation.  In answer to Question No. 7, the jury found
that Ng’s fraud caused TFNB damages in the amount of $200,000 for the loss in
the FFP lawsuit and $103,139.05 for the loss in overdrafts.  We discuss each of these in turn.

1.  Fraudulent Nondisclosure & the FFP
Lawsuit








In its suit
against TFNB, FFP alleged that TFNB had participated in Alyna’s breach of
trust, had made negligent misrepresentations, and had unlawfully refused to pay
a cashier’s check.  In the present
lawsuit, TFNB alleged that Ng committed fraud against it by failing to disclose
certain material facts, i.e., that no one had paid for the money orders
deposited in Alyna’s accounts (and on which he granted immediate credit) and
that many of them were made out to Alyna or affiliated entities.  TFNB further alleged that this failure to
disclose caused damages in the FFP litigation. 
These allegations fit within the fraudulent nondisclosure portion of the
court’s charge.  Thus, TFNB was required
to prove that Ng (1) failed to disclose a material fact that was within his
knowledge, (2) knew that TFNB did not possess that knowledge and did not have
an equal opportunity to discover it, and (3) intended to induce TFNB into
taking some action by his failure to disclose, and (4) that TFNB suffered
injury as a result.  Ng attacks the proof
regarding the second and third elements.

Regarding the
second element, Ng contends TFNB had an equal opportunity to discover the truth
because other officers and employees had access to the deposit records.  However, this argument ignores the fact that
Ng was the loan officer on the account, he was a senior vice president, and
there was testimony that he reviewed the daily deposits in the account
(including the money orders) and that he had to approve immediate credits on
the money orders before the cashier’s check could be issued.  Further, there was testimony that other TFNB
officers and employees relied on Ng for information on the Alyna accounts and
that such reliance was reasonable in the industry.  Indeed, this appears to be exactly what
Kramer and Massey were doing during the teleconference concerning the cashier’s
check—relying on Ng for information.  The
evidence clearly supports the conclusion that other TFNB officers and employees
did not have an equal opportunity to discover the truth regarding the money
orders.








Ng next argues
that TFNB failed to prove he knew that the nature of the money orders was
material during the relevant time period, i.e., when he met with Kramer
and Massey and the decision to stop payment on the cashier’s check was
made.  This argument appears to pertain
to the third required element that Ng must have intended to induce TFNB into
taking some action.[12]  Knowledge and intention of a party often defy
direct evidence; thus, a jury may rely on circumstantial evidence in making
these determinations.  IKON Office
Solutions, Inc. v. Eifert, 125 S.W.3d 113, 124 (Tex. App.—Houston [14th
Dist.] 2003, pet. denied) (intent to defraud); Bransom v. Standard Hardware,
Inc., 874 S.W.2d 919, 924 (Tex. App.—Fort Worth 1994, writ denied)
(knowledge of defendant in fraud case). 
Here, there appears to be no direct evidence that Ng intended TFNB to
act a certain way.  In his testimony, Ng
insisted that at the time the cashier’s check was stopped, he thought the
deposit of money orders was an acceptable practice.  However, the jury may have reasonably
concluded that this assertion was not credible given the evidence that (1) FFP
had complained to Ng about Alyna’s failure to pay for money orders, (2) FFP had
demanded TFNB freeze Alyna’s accounts, and (3) Ng reviewed the daily deposits
and thus would have known that many of the money orders were made out to Alyna
or entities related to Alyna.[13]  Since the conversation between Ng, Kramer,
and Massey was about whether to stop payment on the cashier’s check, it could
also be inferred that by not disclosing the nature of the orders, Ng intended
for TFNB to stop payment.[14]

As a factual
sufficiency argument, Ng further questions how he could have known that the
undisclosed fact was material when TFNB’s own attorney in the FFP lawsuit
acknowledged that the harmfulness of Ng’s deposition became apparent only when
trial was imminent.[15]  However, the attorney’s testimony suggests
little about the basic materiality of Ng’s knowledge; he averred only that it
became apparent close to trial that Ng’s unrevealed knowledge would decide
the case.  Thus, even in light of the
attorney’s comments, the jury could have reasonably determined that Ng realized
that this knowledge was material.  Based
on the foregoing, we find that each of Ng’s sufficiency arguments regarding his
alleged fraudulent nondisclosure is without merit.

 








2.  Fraudulent Misrepresentations & the Alyna
Overdrafts

In September 1998,
Ng reported in the monthly Watch List Report submitted to the Board of
Directors that “[t]he overdraft [on the Alyna accounts] is fully covered by provisional
credit.”  TFNB alleged that this
representation was fraudulent and persuaded the Board to not cut off the
overdrafts.  These allegations fit within
the fraudulent misrepresentation portion of the court’s charge.  Thus, TFNB was required to prove that Ng (1)
made a material misrepresentation to TFNB, (2) with knowledge of its falsity or
recklessly without any knowledge of the truth and as a positive assertion, and
(3) with the intention that TFNB should act on the misrepresentation, and (4)
that TFNB acted in reliance on the misrepresentation and thereby suffered harm.[16]  Ng attacks the sufficiency of the evidence on
all four elements of fraudulent misrepresentation.








Regarding the
first element, Ng contends that any misrepresentation regarding provisional
credit was not material because, when the statement was removed from the
October Watch List, the “action plan” regarding Alyna stayed the same.  “Material” was not defined in the charge, but has been
defined as “substantial,” “noticeable,” and “relevant.”  The
New Am. Heritage Dictionary 772 (2d College ed. 1991).  There are at least two reasons why the jury
could have reasonably considered the statement to be material, even assuming
the board did not change the approach to the overdrafts after the statement was
removed.  First, there is no evidence
that the falsity of the statement was ever disclosed, nor was it revealed in
subsequent Watch Lists that the overdraft was no longer fully covered by a
provisional credit.  It is therefore
possible that the board could have continued to believe the credit still
existed.[17]  Second, having started the action plan in
September with the allowance of overdrafts, TFNB had sunk costs associated with
the plan; consequently, by the time the notation was removed, the situation had
substantially changed.  In other words,
the provisional credit statement started the ball rolling regarding the
overdrafts, and once begun, it would have been difficult to shut them
down.  Thus, the jury could have
reasonably concluded that the statement was material, and Ng’s argument to the
contrary is without merit.

Next, Ng contends
that the statement regarding provisional credit was accurate when made.  This argument relates to the first and second
elements of fraudulent misrepresentation. 
There was evidence that the overdrafts totaled $108,000 at the time the
Watch List statement was made.  Ng
contends that, as part of the provisional credit, he was counting on (1)
$75,000 in late return items (apparently including FFP money orders that were
not disputed), which were eventually credited to Alyna’s accounts, and (2)
$45,000 in disputed money orders that he included on the alleged advice of
counsel.  The only record support offered
for the claim that the first set of items eventually cleared is Ng’s own
testimony.  Because this testimony was
uncontroverted, it may have been sufficient to established that these items did
in fact cover the overdraft for up to $75,000. 
However, regarding the second set of items, even if the attorney advised
Ng that he could include the items in the provisional credit, the attorney would
have done so in ignorance of the true nature of the money orders deposited in
Alyna’s account.  Indeed, there is no
evidence that anyone at TFNB other than Ng knew that the deposited money orders
had never been paid for and that many were made out to Alyna or affiliated
entities.








Regarding the
third element of fraudulent misrepresentation, Ng contends that there was no
evidence regarding any intent on his behalf to cause the Board to act in any
particular way.  This argument begs the
question.  Clearly, if the jury believed
that Ng misrepresented that the overdrafts were covered by provisional credit,
they could have logically inferred from this that Ng intended the board to
permit the overdrafts.  Intent may certainly be proven by
circumstantial evidence.  Mladenka v.
Mladenka, 130 S.W.3d 397, 405 (Tex. App.—Houston [14th Dist.] 2004, no
pet.).[18]

Regarding the
fourth element, Ng contends that Kramer knew exactly what was occurring with
the credits; thus, Ng could not have been held to have defrauded TFNB.  This argument fails for several reasons.  First, besides one record citation, it is not
developed with authority or explanation. 
See Tex. R. App. P. 38.1(h)
(“The brief must contain a clear and concise argument for the contentions made,
with appropriate citations to authorities and to the record.”).  Second, the record cite Ng provides is to his
own testimony wherein he suggested that Kramer was aware that the provisional
credit was based on deposited money orders; however, Ng does not claim that
Kramer knew the nature of the money orders. 
Thus, Kramer lacked information essential to determining the truth of
Ng’s Watch List statement.[19]  And third, the argument ignores the fact that
the jury found Kramer was also culpable for TFNB’s damages.  In other words, the jury apparently did
consider that Kramer may have acted improperly, but the jury refused to find
that Kramer’s actions completely exonerated Ng. 
Based on the foregoing, we find that each of Ng’s sufficiency arguments
regarding the alleged fraudulent misrepresentations is without merit.

 

 








3.  Ng’s Additional Arguments Regarding the Fraud
Finding

Finally, Ng
presents three reasons he claims TFNB cannot prevail on its fraud claims even
if he did mislead TFNB: (1) he was an employee of TFNB and a corporation cannot
defraud itself; (2) Alyna’s fraudulent acts, not his, were the proximate cause
of TFNB’s injuries; and (3) TFNB did not prove it’s reliance was
justified.  We discuss each argument in
turn.








Ng first contends
that his actions could not have defrauded TFNB because a corporation cannot
defraud itself and, at all times relevant to this case, he was operating within
the course and scope of his employment with TFNB.  This argument is waived by failure to
preserve it in the trial court and failure to properly present it on
appeal.  Ng neither requested nor
obtained a finding that he was acting in the course and scope of
employment.  Tex. R. App. P. 33.1(a).[20]  He also fails to provide any argument or
record citations for his claim that he was always acting in the course and
scope.  Tex.
R. App. P. 38.1(h).  Further, he
relies heavily on tortious interference cases to make the argument that an
employee cannot defraud his or her employer, and these cases are readily
distinguishable.  In Holloway v.
Skinner, appellant’s primary citation, the court held that a third–party
claim for tortious interference against a corporate officer could only be
successful if the party showed that the officer acted so contrary to the best
interests of the corporation that the actions could only have been motivated by
personal interests.  898 S.W.2d 793, 796
(Tex. 1995).  The policy rationale underlying
this rule is that corporate officers should be free to advise the corporation
without fear of a third party claiming that the advice interfered with their
contractual relation with the corporation. 
Id. at 795.  Such rationale
does not apply in the present situation where an officer is being charged with
defrauding the corporation itself. 
Furthermore, even if Ng is correct that his conduct should have been
judged under this “personal interest” standard, he did not request that such an
instruction be included in the charge; thus, he waived the argument.  Tex.
R. App. P. 33.1(a).








Ng further
contends that the cause in fact of TFNB’s damages was Alyna’s decision to
engage in various fraudulent acts, citing Peeler v. Hughes & Luce,
909 S.W.2d 494, 498 (Tex. 1995).  In
making this argument, Ng misconstrues the nature of proximate cause and the
import of Peeler.  The trial court
defined “proximate cause” in the jury charge as “that cause which, in a natural
and continuous sequence, produces an event, and without which cause such event
would not have occurred.”  See Lear
Siegler, Inc. v. Perez, 819 S.W.2d 470, 471 (Tex. 1991) (stating that
conduct is a cause if in a natural and continuous sequence it produces an event
and without it the event would not have occurred); Cathey v. Meyer, 115
S.W.3d 644, 663 (Tex. App.—Waco 2003, pet. filed) (defining proximate cause
similarly in fraud context).  The charge
further recognized that there can be more than one proximate cause under Texas
law.  See Lear Siegler, 819 S.W.2d
at 471.  Although Alyna’s activities were
indeed a cause of damages to TFNB, the focus of the present lawsuit was Ng’s
activities that might have proximately caused certain damages.  Ng is the one who allegedly failed to
disclose material information and allegedly made misrepresentations.  The question is whether he engaged in the
alleged conduct and whether it was a proximate cause of TFNB’s damages.  The jury answered “yes” to both questions.[21]  The Peeler opinion involved a
malpractice claim by a criminal defendant against his defense attorney.  909 S.W.2d at 495-96.  The court in Peeler recognized that
there can be more than one proximate cause of damages but explained that public
policy required a rule that a convicted criminal defendant’s “damages” are
caused by his own conduct as a matter of law unless and until his innocence is
later established.  Id. at
495-98.  Thus, the Peeler case
provides no support for Ng’s argument.[22]

Lastly, Ng
contends that TFNB has not shown that its reliance on his alleged misrepresentations
was justifiable.[23]  However, the jury charge on fraud did not
require TFNB’s reliance to be reasonable or justifiable.  Ng did not object to the charge on this
ground and makes no argument that it was a deemed element.  See Osterberg, 12 S.W.3d at 55;
Tractebel Energy Mktg., Inc. v. E.I. Du Pont De Nemours and Co., 118
S.W.3d 929, 932 (Tex. App.—Houston [14th Dist.] 2003, pet. denied).  Accordingly, Ng has waived this contention.[24]








4.  Conclusion

We find that the
evidence was legally and factually sufficient to support the conclusion that Ng
committed fraud against TFNB by (1) failing to disclose a material fact
resulting in losses in the FFP litigation and (2) making a material
misrepresentation that resulted in overdraft losses on the Alyna accounts.  Accordingly, we overrule Ng’s first issue.

B.  Fiduciary Duty

In his second
issue, Ng attacks the legal and factual sufficiency of the evidence to support
the jury’s breach of fiduciary duty finding. 
The record reflects, however, that the trial court based its judgment
against Ng solely on the fraud findings and not on the breach of fiduciary duty
findings.  TFNB did not attack this
holding in the trial court and does not do so on appeal.  Because we uphold the judgment based on the
fraud finding, we need not address any issues related to the breach of
fiduciary duty claim against Ng. 
Accordingly, Ng’s second issue is overruled as moot.

III.  Wu’s Liability








In his sole issue,
Wu contends that the evidence is legally and factually insufficient to support
the finding that he breached his fiduciary duty.  Because Wu does not challenge the language of
the charge on appeal, we review the sufficiency of the evidence in light of the
charge as given.  Osterberg, 12
S.W.3d at 55.[25]  In finding a breach of fiduciary duty, the
jury essentially found that Wu failed to be diligent and prudent in managing
the bank’s affairs, that he failed to handle his corporate duties with such
care as an ordinary prudent man would have used under the circumstances, and
that his conduct did not fall within the business judgment rule.  To prevail on a breach of fiduciary duty
claim, a plaintiff must prove the existence of such a duty, a breach of that
duty, causation, and damages.  Abetter
Trucking Co. v. Arizpe, 113 S.W.3d 503, 508 (Tex. App.—Houston [1st Dist.]
2003, no pet.).  Wu does not dispute that
he owed a duty to TFNB or that TFNB lost money on the Alyna overdrafts, but he
does dispute breach and causation.[26]

The parties agree
that TFNB’s breach of fiduciary duty claim is based on allegations that (1) Wu usurped
Kramer’s authority as president and (2) Wu permitted Ng’s reckless behavior in
regard to the Alyna accounts.  Each will
be discussed in turn.

 

 








A.  Usurped Authority

TFNB alleged that
Wu usurped Kramer’s authority and prevented him from properly supervising Ng
and the Alyna accounts.  Kramer testified
that Wu once told him that his predecessor as president and CEO was just a
“figurehead.”  Kramer stated that he did
not have the authority to fire Ng nor could he hire part-time help when needed,
and all expenses had to be approved by the executive committee, which he said
usually fell in line with Wu.[27]  Wu’s own banking expert, Rusty Williams,
acknowledged that these restrictions would not be consistent with a CEO’s
having the necessary authority to do his job. 
Kramer further stated that Wu decided to fire a loan assistant at one of
the branches without consulting or explaining the decision to Kramer.  Wu apparently formed a personnel committee
without including Kramer, and when Kramer complained, Wu added him to that
committee but then split off an “examining committee,” again excluding Kramer.[28]  Gregory Lueb, a TFNB senior vice-president,
who testified as both a fact and expert witness, stated that after the split
the examining committee should not have ordinarily gotten involved in personnel
decisions; however, committee meeting minutes demonstrate that it made numerous
personnel decisions, including the decision to grant a bonus to Ng and two
others, the amount of which was to be determined by Wu.[29]  Lueb concluded that Kramer’s authority was
being taken away.  After its annual
inspection of TFNB in 1998, the Office of the Comptroller of the Currency told
the bank that it needed to give its officers sufficient authority to do their
jobs.








Various other
witnesses testified regarding Wu’s authority and Kramer’s apparent lack
thereof.  Michael Klobosits, TFNB’s
internal auditor, testified that it seemed at times that the president had less
authority than he once did and that the chairman or the executive committee was
running certain issues.  Carol Chiu, a
TFNB director and member of the executive committee, stated that she didn’t
think Kramer had any influence on what happened in the executive committee or
the board and that Kramer acted like “Wu [was] the controller.”  David Wang, a former TFNB chief lending
officer and acting president, stated that neither he nor Kramer had any
authority as president and that Wu and the vice chairman, Milton Yang, were
making the day-to-day decisions for the bank when Wu was chairman.  Wang further stated that Wu told him Kramer
was hired to be a “yes man.”  Rhonda
Hudson, owner of an independent company hired to investigate the handling of
the Alyna accounts, stated that through her dealings with TFNB, she came to the
understanding that “[p]retty much everything was decided by Mr. Wu.”  She further said that she was “not sure
Kramer had a great deal of authority.” 
There was also testimony from Lueb, the senior vice-president, that Ng
told him that Wu, not Kramer, was actually running the bank.

There was also
testimony that Wu took an unusually active roll in lending decisions.  Sherry Miles, a former TFNB executive
vice-president, testified that Wu personally made decisions about loans on
which she was the loan officer.  Kramer
testified that he frequently observed Wu talking to loan officers in their
offices, apparently about loan customers, with loan files open on their desks.

Kramer was also
given two sets of “Executive Orders” from Wu without Kramer’s having had any
input in them.  Wu contends that these
orders were issued by the executive committee, but both documents are from Wu
to Kramer, and, although one of them does indicate that the committee had
approved the orders, the other document does not reference any committee
approval.  These documents list a series
of actions for Kramer to take, mostly regarding individual personnel
assignments but also canceling the purchase of a new phone system and combining
two departments into one.  There was
testimony from several sources that the issuance of such executive orders by a
bank chairman to a bank president and CEO would severely undercut the president
and CEO’s authority.








In response to
this evidence, Wu primarily points out that except for complaining that he was
not on the personnel committee, Kramer apparently never complained to Wu about
his lack of authority.  However, this
failure to complain does not negate the considerable evidence that Wu usurped
Kramer’s authority.  Assuming, as the
evidence strongly suggests, that Wu did deprive Kramer of authority, the jury
could have easily inferred that Wu knew what he was doing, and that any
objection on Kramer’s part would have been unavailing.  Further, there was testimony that Kramer did
complain about his lack of authority to others.

Wu additionally
cites scattered pieces of evidence to show that Kramer did have some authority
in the bank and that he attempted to control Ng at times.  Although this is some evidence that Kramer
had sufficient authority, it is anecdotal and far from conclusive.

Wu also points out
that there is no mention in the executive committee minutes, the OCC reports,
or the Hudson Report[30]
regarding Wu’s taking Kramer’s authority. 
However, as mentioned above, the OCC cautioned TFNB to give its officers
sufficient authority to do their jobs, and Hudson herself testified that it
appeared to her that Wu was in charge. 
In summary, there was significant evidence that Wu usurped Kramer’s
authority as president and CEO.

B.  Ng’s Reckless Behavior








TFNB further
alleged that, having supplanted Kramer’s authority, Wu’s conduct permitted Ng’s
reckless behavior, which resulted in the Alyna overdraft losses.  Kramer testified that he had a conversation
with Ng in which he (Kramer) expressed his concerns regarding the overdrafts
and asked “when do we pull the plug?  How
long do you go on allowing this, especially when we know the customer has
problems[?] So how long do you throw good money after bad money?” and Ng
responded that he was discussing the matter with Wu.  Kramer further testified that he warned Wu on
several occasions that Ng was being reckless in relation to the Alyna
accounts.  Kramer said that Wu responded
with statements like “I know” and “I know what you mean” and by nodding his
head.  Kramer interpreted these responses
as an indication that Wu heard and understood him and that the rest was up to
Wu.  There was also evidence that Wu knew
Kramer did not speak Chinese, but during executive committee meetings when the
issue of Alyna came up, Wu would sometimes speak in Chinese to Ng in front of
Kramer.  Furthermore, Lueb, testifying as
both a fact and an expert witness, concluded that Wu should be held liable
because he knew of Ng’s conduct, knew that it constituted a variance to the
bank’s lending policy, and yet did nothing to stop it.  Based on this evidence, it was reasonable for
the jury to conclude that, because of Wu’s usurpation of Kramer’s authority and
his dealing directly with Ng regarding the Alyna accounts, Wu’s conduct
permitted Ng to operate recklessly in regard to the Alyna accounts.

In response, Wu
argues that because he did not have “full knowledge” of the problems with the
Alyna accounts he cannot be held liable for the damages resulting from Ng’s
conduct.  He does not, however, offer any
authority suggesting that because a tortfeasor doesn’t have “full knowledge” of
the ramifications of his tortious acts he cannot be held liable for those
acts.  The charge on breach of fiduciary
duty does not mention “full knowledge” but instead emphasizes diligence and
prudence, “due care,” “good faith,” and “a rational business purpose.”  The jury found that Wu’s conduct did not meet
these criteria.  Wu acknowledged that he
knew Alyna was a problem customer, was suspected of kiting checks in the past,
and had caused the bank to be sued, and Ng was allowing overdrafts far beyond
his limits.  Yet, despite this knowledge,
Wu prevented Kramer from properly supervising Ng and apparently did nothing to
rein in Ng himself.[31]








Lastly, Wu argues
that the conduct of Kramer and Tsao is relevant to determining whether he
breached his fiduciary duty.  Clearly,
the jury considered their conduct because it found that each of them breached
their fiduciary duty to TFNB.[32]  Wu’s argument that the conduct of Tsao and
Kramer somehow exonerates him is not well-founded.  Wu basically claims that while Kramer and
Tsao were aware of Alyna’s kiting, he was not. 
He suggests that, had he been aware, he would have handled the accounts
differently.  However, Wu provides no
authority supporting these arguments. 
There was evidence that Wu possessed considerable knowledge regarding
the Alyna accounts, he usurped Kramer’s authority, and he dealt personally with
Ng regarding the accounts.  Wu offers no
plausible argument how the tortious conduct of Kramer and Tsao exonerates him
for his conduct.

C.  Conclusion

The evidence is
sufficient to support the conclusion that Wu usurped Kramer’s authority as
president and CEO and that he permitted Ng’s recklessness in handling the Alyna
accounts.  Accordingly, we find that the
evidence is legally and factually sufficient to sustain the jury finding that
Wu breached his fiduciary duty to TFNB and that this breach proximately caused
TFNB’s damages.  Wu’s sole issue is
overruled.

IV.  Ratification

In response to
Question No. 7, the jury found that TFNB ratified the conduct of Wu and
Ng.  Apparently based on this finding,
the trial court entered judgment favoring Wu on the breach of fiduciary duty
claim.  However, the court declined to
apply the ratification finding to the fraud finding against Ng.  On appeal, TFNB argues, among other things,
that because the evidence is legally insufficient to support the jury’s
ratification finding, the court correctly disregarded the finding as it
pertained to Ng but erred in refusing to disregard the finding as it pertained
to Wu.[33]  We agree.








Because no one
objected to the submission on ratification, we review the sufficiency of the
evidence in light of the charge as given. 
See Osterberg, 12 S.W.3d at 55; Tractebel, 118
S.W.3d at 932.  Question No. 7 read as
follows:

Did Texas First National Bank
ratify the conduct of either Herbert Ng or Kenneth Wu or both?

A party’s conduct includes conduct
of others that the party has ratified. 
Ratification may be express or implied.

Implied
ratification occurs if a party, though he may have been unaware of unauthorized
conduct taken on his behalf at the time it occurred, retains the benefits of
the transaction involving the unauthorized conduct after he acquired full knowledge
of the unauthorized conduct.  Implied
ratification results in the ratification of the entire transaction.

The jury answered
“yes” as to both Ng and Wu.  Because the
charge treats express and implied ratification in somewhat different terms, we
shall discuss each separately.[34]








A.  Express Ratification

The charge does
not define “ratify,” “ratification,” or “express ratification,” so we look to
the usual meanings of those terms.  “Ratification” is defined as “[t]he
act of ratifying or the condition of being ratified.”  The
New Am. Heritage Dictionary 1028 (2d College Ed. 1991).  “Ratify” means [t]o give formal sanction to;
approve and so make valid.”  Id.  “Express” has multiple meanings as an
adjective, including “[d]efinitely and explicitly stated,” and “[p]articular;
specific.”  Id. at 478.  Accordingly, “express ratification” of
another’s conduct means a definitely and explicitly stated formal sanction or
approval that validates the conduct.

Wu emphasizes the
fact that the charge defined implied ratification as requiring full knowledge
of the conduct being ratified but did not define express ratification as
requiring full knowledge.[35]  In other words, Wu would define express
ratification as any indicium of ratification regardless of whether the ratifier
knew what he, she, or it was ratifying.[36]  Yet Wu does not attempt to explain how
someone could expressly ratify (meaning a definitely and explicitly stated
formal sanction or approval of) another’s conduct without full knowledge of
that conduct.  Logically, a definition of
express ratification, given the context of its use in the charge and the common
definition set forth above, includes full knowledge because the term
itself denotes that the ratifier has full knowledge of what he, she, or it is
ratifying.  Thus, we interpret the charge
as requiring full knowledge as an element of express ratification.  This interpretation comports with the common definitions of
the words, parallels the definition of “implied ratification” given in the
charge, and comports with the accepted law of ratification.  See Samms, 23 S.W.3d at 403.[37]








Wu and Ng allege
that TFNB expressly ratified their conduct on several occasions, specifically
when (1) TFNB shareholders voted at their annual meetings in 1999 and 2000 to
ratify and affirm “the actions adopted by the Board of Directors and officers
during the past year”; (2) the board of directors “approved” the monthly
Overdraft Reports, which included notation of the Alyna overdrafts; (3) the
board of directors “approved” the monthly Watch List Reports, which included
the so-called “action plan” for dealing with Alyna’s debt[38];
(4) the executive committee approved certain exceptions to the TFNB lending
policy in regard to a proposed consolidation loan for Alyna[39];
and (5) the executive committee reviewed and discussed the executive orders
issued by Wu.[40]








Regardless of
whether any of these acts could have constituted ratification of Ng’s or Wu’s
conduct had there been proof of full knowledge at the time of the acts, we find
that there is no evidence in the record that full knowledge was possessed at
the time of the alleged ratifications. 
Wu and Ng emphasize that the fact of the overdrafts was well known and
that ratification of these overdrafts ratified the conduct that resulted in the
overdrafts.  However, ratification of the
results of conduct without full knowledge of the conduct does not constitute
express (or implied) ratification of the conduct.  See Spangler v. Jones, 861 S.W.2d 392,
394-96 (Tex. App.—Dallas 1993, writ denied) (holding that principal’s
ratification of contract did not ratify agent’s conduct in negotiating the
contract)[41];
Vessels, 823 S.W.2d at 764-66 (holding that
ratification of a subsequent agreement did not ratify prior tortious conduct).  Even assuming that the shareholders, board
members, and executive committee members approved or ratified the overdrafts,
such action does not constitute ratification of Ng’s or Wu’s conduct, which the
jury found caused the losses on the overdrafts. 
The evidence supports the conclusion that Ng proximately caused a
portion of TFNB’s losses by making fraudulent misrepresentations and by
fraudulently failing to disclose material facts.  The evidence further supports the conclusion
that Wu proximately caused a portion of the overdraft losses when he breached
his fiduciary duty by usurping Kramer’s authority and permitting Ng’s reckless
behavior.  Neither Ng nor Wu point to any
evidence that the shareholders, the board of directors, or the members of the
executive committee knew about Ng’s fraudulent conduct or Wu’s breach of
fiduciary duty at the time of the alleged acts of ratification.[42]








Indeed, in his
briefing, Wu concedes that the board and the committee did not possess full
knowledge regarding the Alyna accounts and would have reacted differently had
they known.  Wu states:  “The evidence was uncontroverted that Wu was
not aware of all material information when he was voting on the handling of the
Alyna accounts.  The [board of directors]
depends on the information it receives to make decisions.  The [board] and the [executive committee]
were making decisions without full knowledge of what was happening in the Alyna
account. . . . [If the board and committee had the material information] the
Alyna accounts would have been handled much differently and probably shut down
immediately.”[43]  We could not have said it better ourselves.[44]








Because there is
no evidence that at the time of the alleged ratifications any of the alleged
ratifiers had full knowledge of Ng’s or Wu’s conduct that proximately caused
the overdraft and FFP lawsuit losses, we find that the evidence is legally
insufficient to sustain a finding that TFNB expressly ratified Ng’s or Wu’s
conduct resulting in those losses.

B.  Implied Ratification

Regarding implied
ratification, Wu and Ng allege that TFNB impliedly ratified their conduct
because members of the board of directors and the executive committee knew that
the Alyna overdrafts were occurring, yet they approved the Overdraft Reports
and the so-called “action plan” and no one objected to the overdrafts.[45]  However, the definition of “implied
ratification” used in the charge clearly required “full knowledge” of the
conduct being ratified before ratification could occur.  As explained above regarding express
ratification, there is no evidence that the board of directors or the executive
committee obtained full knowledge of Wu’s or Ng’s conduct until well after the
alleged acts of ratification.

Accordingly, we
find that the evidence was legally insufficient to support the ratification
finding.  Thus, the trial court correctly
disregarded the ratification finding in regard to the fraud finding against Ng,
but the court erred in applying the ratification finding to negate the breach
of fiduciary duty finding against Wu. 
Consequently, the court also erred in awarding a take nothing judgment
in favor of Wu and in awarding indemnification to Wu.

V.  Jury Question








In his fourth
issue, Ng contends that the trial court erred in refusing to submit a jury
question concerning TFNB’s contributory negligence.  When a party complains of error in the
omission of an instruction that he relies upon, he must complete three steps to
preserve error: (1) tender a properly–worded proposed instruction in writing
and prior to submission, (2) specifically object to the omission, and (3)
obtain a ruling from the court.  Riddick
v. Quail Harbor Condo. Ass’n, Inc., 7 S.W.3d 663, 674-75 (Tex. App.—Houston
[14th Dist.] 1999, no pet.).  The
reporter’s record indicates that Ng requested an addition to the charge
regarding TFNB’s contributory negligence and that the trial court denied the
request.  However, the requested charge
itself is not contained in the record, either in the clerk’s record or dictated
into the reporter’s record. 
Consequently, it is impossible to tell whether the issue was submitted
in substantially correct form. 
Accordingly, the issue is waived. 
Tex. R. Civ. P. 278; Garza
v. Southland Corp., 836 S.W.2d 214, 218 (Tex. App.—Houston [14th Dist.]
1992, no writ).

Conclusion

In summary, we
hold that the ratification finding was not supported by legally sufficient
evidence but the findings of fraud against Ng and breach of fiduciary duty
against Wu are supported by legally and factually sufficient evidence.  Further, Ng’s charge issue was waived.  Because of our disposition of these issues,
we need not consider the parties’ remaining issues; thus, they are overruled as
moot.  Accordingly, we affirm the trial
court’s judgment as it pertains to Ng but reverse that portion of the judgment
favoring Wu.  We further sever the
portion of the judgment concerning Wu and remand for entry of a new judgment in
accordance with this opinion.[46]

 

 

/s/      Adele
Hedges

Chief Justice

 

 

Judgment rendered
and Opinion filed March 3, 2005.

Panel consists of
Chief Justice Hedges and Justices Fowler and Seymore.











[1]  As one witness
phrased it at trial, Alyna was stealing the use of money from FFP.





[2]  There is
considerable bickering in the briefs and in the record regarding whether Ng was
told in this conversation that Alyna was “out of trust,” although Ng admitted
that he was “essentially” told that Alyna was out of trust.





[3]  To cover the
amount of the check, on August 3 and 4, Alyna deposited $110,000 in cash,
checks from other Alyna accounts totaling almost $60,000, about $14,000 in FFP
money orders, and checks from third parties amounting to over $18,000.  The check issued on August 4 and was debited
on August 5.  Michael Klobosits, TFNB’s
internal auditor, testified that in order for the funds deposited on the 3rd
and 4th to be available on the 5th, Ng, as the Alyna loan officer, would have
to have reviewed the items and “force paid” the noncash deposits, thus giving
Alyna immediate credit for items that had yet to clear.  Ng, however, denied that he reviewed these
deposits.





[4]  In his
testimony, Ng consistently asserted that at the time he saw nothing wrong with
the deposited money orders.





[5]  The jury found
$711,293.80 in actual damages, but this figure was reduced based on FFP’s
failure to mitigate.  The amount of
attorney’s fees was calculated to be $334,000 through trial, plus additional
amounts if the case was appealed.





[6]  As explained
by one of the experts at trial, check kiting occurs when a “kite artist” uses
checks drawn on his or her account at one bank to cover checks written on his
or her account at another bank, and vice versa, so that a circle is created in
which no money is actually being deposited in either bank.  Check kiting is illegal, and it requires the
grant of immediate credit from both banks on the deposited checks from the
other bank.  Once one of the banks
refuses to grant immediate credit (as AFNB did here), the kite collapses.





[7]  At trial, TFNB
also attempted to tie Wu to the losses incurred in the FFP litigation; however,
the jury awarded only $1 in damages against Wu based on that lawsuit.  The parties raise no issues concerning Wu and
the FFP litigation.





[8]  Kramer and
Tsao were not defendants at trial.





[9]  Wu was not
included in the proportionate liability question.





[10]  The court
broke the fees and expenses down as follows: (1) $390,000 as attorney’s fees
and expenses related to trial; (2) $60,000 for expert witness costs; (3)
$21,750 for litigation support costs; (4) $3,955.44 for copying costs; (5)
$45,000 in the event of an appeal to the court of appeals; and (6) $15,000 in
the event of an appeal to the supreme court.





[11]  Question No. 5
asked the jury as follows:

 

Did Herbert Ng commit fraud against Texas First
National Bank?

Instructions: Fraud occurs when ---------

a.          a party makes a material misrepresentation

b.         the misrepresentation is made with knowledge of its falsity
or made recklessly without any knowledge of the truth and as a positive
assertion

c.         the misrepresentation is made with the intention that it
should be acted on by the other party, and

the other party acts in reliance on the
misrepresentation and thereby suffers injury.

Instructions: Fraud also occurs when--------

a.          a party fails to disclose a material fact within the
knowledge of that party,

b.         the party knows [that] the other party is ignorant of the
fact and does not have an equal opportunity to discover the truth,

c.         The party intends to induce the other party to take some
action by failing to disclose the fact, and

d.         The other party suffers injury as a result of acting without
knowledge of the undisclosed fact.

Definition: Misrepresentation means a false statement of fact.





[12]  There is no
express requirement in the charge that Ng must have known the information was
material.





[13]  Additionally,
there was evidence that at least three different TFNB employees warned Ng about
the Alyna accounts.  Carrie Chin, a
long-time teller, testified that she told Ng “[t]his account is not good,” she
questioned him as to why he always approved items on the account, and he just
told her not to worry because he would take care of the account.  Tsao, the chief cashier, testified that he
told Ng he suspected check kiting on the Alyna accounts.  Ng denied the warning from Chin and Tsao, but
he admitted that Kramer warned him about giving immediate credit on uncollected
funds to Alyna.





[14]  Indeed, there
was testimony that had the information been known, the situation involving
Alyna and FFP would have been handled very differently.  There was also a suggestion in the record
that Ng called FFP’s charges against Alyna “nonsense” during the conversation
but still did not reveal Alyna’s deposit of money orders payable to
itself.  This may suggest Ng also made a
material misrepresentation, but because we find that the evidence was
sufficient to support the verdict on the material nondisclosure theory, we need
not address the misrepresentation theory as it pertains to the FFP litigation.





[15]  This issue
also appears to address the third element of fraudulent nondisclosure.  See supra n.12.





[16]  There was also
evidence that the board and the committee would have acted very differently in
regard to Alyna had they known of its (and Ng’s) conduct in relation to the
money orders deposited in its accounts. 
Thus, the jury could have also concluded that Ng committed fraud by
failing to disclose the truth regarding the money orders and that this
proximately caused the overdraft losses. 
However, because we find that the evidence was sufficient to support the
verdict on the fraudulent misrepresentation theory, we need not address the
nondisclosure theory as it pertains to the overdrafts.





[17]  Indeed,
subsequent Watch List notations indicated that at least $75,000 of the credit
would be available by a particular date and that the bank’s attorney would be
consulted regarding using the cashier’s check as an offset to the
overdrafts.  These statements do not
negate the notion that the overdrafts were still fully covered.





[18]  Ng also raises
an issue regarding motive.  If the jury
believed, as it apparently did, that Ng put TFNB in this situation by
improperly accepting the money orders into the accounts and granting immediate
credit on them, it would be a reasonable conclusion that he then wanted to find
a way out of the mess by keeping the stores operating in the hope that a
generous sales price would make everything come out all right.  Thus, the jury could have concluded that Ng
did have a motive in misrepresenting the true facts to the board and an intent
to do so.





[19]  The true
nature of the money orders suggests that FFP would never have paid them; thus,
they could not have been part of a credit to Alyna or TFNB.





[20]  Nor was this
issue raised in Ng’s motion for new trial.





[21]  As mentioned
above, there was evidence that the board of directors would have acted very differently in regard to
Alyna and probably would have shut down the accounts if they had known the
truth about the credit and Alyna’s misuse of money orders.





[22]  Ng
additionally argues that he could not be held liable for Alyna’s fraud without
having been shown to have acted as Alyna’s agent, citing Cimarron Insurance
Co. v. Southwestern Indemnity Co., 161 Tex. 516, 344 S.W.2d 442, 445-46
(1961).  However, as explained above,
TFNB did not sue Ng for Alyna’s fraud, it sued him for his own fraudulent
actions (i.e., misrepresentations and failure to disclose material
facts).  Ng does not otherwise cite the
record or authority or make arguments regarding Alyna being the sole proximate
cause of TFNB’s damages.





[23]  Ng’s basic
argument here is that several other people at TFNB knew about the overdrafts
and the FFP problems, and thus, TFNB was not justified in relying on Ng’s
representations.  However, Ng does not
claim that anyone else at TFNB knew the true nature of the money orders on
which he gave immediate credit, and, as discussed above, there was testimony
that in the banking industry it is reasonable for officers and directors to
rely on the loan officer in charge of an account for information on that
account.





[24]  There appears
to be some disagreement among Texas courts as to whether reliance on fraudulent
misrepresentation must be justifiable in order to recover on the fraud.  The Texas Supreme Court has generally not
required that reliance on another party’s fraud be reasonable or justifiable.  See, e.g., 
Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc., 962,
507, 524 (Tex. 1998) (listing elements of common law fraud cause of action); Koral
Indus. v. Sec.–Conn. Life Ins. Co., 802 S.W.2d 650, 651 (Tex. 1990)
(explaining in the fraudulent inducement context that a victim of fraud is
generally under no duty to use due diligence or proper care to discover the
truth); see also Comm. on Pattern
Jury Charges, State Bar of Tex., Texas Pattern Jury Charges—Business, Consumer,
Insurance & Employment PJC 105.2 & cmt. (2003) (omitting any
reference to reasonableness or justifiability and concluding that it is not a
required element).

However, in Ernst & Young, L.L.P.
v. Pacific Mutual Life Insurance Co., the supreme court held that when an
allegedly fraudulent misrepresentation was not made to induce a particular
party into an action, a party claiming fraud must show that its reliance on the
statement was justifiable.  51 S.W.3d
573, 577-80 (Tex. 2001).  Some courts of
appeal have since cited Ernst & Young for the proposition that
common law fraud always requires a showing of justifiable or reasonable
reliance.  See, e.g.,  Wil‑Roye Inv. Co. II v. Wash. Mut.
Bank, F.A., 142 S.W.3d 393, 411 (Tex. App.—El Paso 2004, no pet.); TCA
Bldg. Co. v. Entech, Inc., 86 S.W.3d 667, 674 (Tex. App.—Austin 2002, no
pet.).  We need not address this apparent
conflict because the charge here did not require justifiable or reasonable
reliance and Ng did not object or claim that it was a deemed element.





[25]  Question No. 2 charged the jury as
follows:

 

Do you find from a preponderance of
the evidence that Kenneth Wu breached his fiduciary duty to Texas First
National Bank with regard to the Alyna account?

Breach of Fiduciary Duty

Directors and officers of a bank
owe a fiduciary duty to the bank, its shareholders, depositors, and
creditors.  As fiduciaries, directors and
officers have a duty to be diligent and prudent in managing the banks [sic]
affairs.  Directors and officers must
handle their corporate duties with such care as an ordinary prudent man would
have used under similar circumstances.  A
breach of fiduciary duty consists of any failure to comply with such standards.

A director or officer of a bank,
however, shall not be held liable if his conduct falls within the business
judgment rule as defined in these instructions.

Business Judgment Rule

You are instructed that a director
or officer of a bank shall not be liable for claims against him if, in the discharge
of his duties, he exercised ordinary care and acted in good faith and honestly
exercised his best business judgment within the limits of the actual authority
of his position with the bank.  A
director or officer of a bank shall not be liable for honest mistake of
judgment if he acted with due care, in good faith, and in furtherance of a
rational business purpose.

You are, further, instructed that a
director or officer who, in performing his duties and functions, acts in good
faith and reasonably believes that reliance is warranted is entitled to rely on
information, including an opinion, report, financial statement or other type of
statement or financial data, decision, judgment, or performance, prepared,
presented, made or rendered by:

(1)              
one or more directors, managers, managing
participants[,] officers, or employees of the depository institution, or of an
entity under joint or common control with the depository institution, who the
director or officer reasonably believes merit confidence; or

(2)               
legal counsel, a public accountant or another
person who the director or officer reasonably believes merits confidence.





[26]  At no point
does Wu state that he appeals from Question no. 4, the damages question, which
included a proximate cause instruction, but his arguments make clear that he is
contesting causation as well.





[27]  Wu contends
that Kramer testified that the executive committee was independent of Wu, but
what Kramer actually said was “it’s usually a majority on that committee that
supports [Wu], so he pretty much can rule in any fashion he wishes.”





[28]  Williams, Wu’s
expert, opined that bank presidents are typically not included on personnel
committees.





[29]  The amount of
the bonus, however, was later approved by the board of directors.





[30]  The Hudson
Report was the result of an investigation by an outside group into the Alyna
accounts.





[31]  Although Ng
and Wu both denied that they conferred privately regarding the Alyna accounts,
there was testimony from at least two other witnesses that they did in fact
confer privately regarding these accounts, and Wu admitted that he told Ng to
make sure the Alyna accounts were okay before he, Ng, went on vacation.  The jury was entitled to consider these
alleged private conversations in assessing Wu’s conduct.





[32]  Wu was not
included in the comparative responsibility question, only Ng, Tsao, and Kramer
were.  TFNB suggests that this is because
Wu did not request inclusion in the question, and there is no other explanation
in the record.





[33]  TFNB makes
this argument in its first issue in its Appellant’s Brief against Wu, and it
makes the argument in its Appellee’s Brief in response to Ng’s argument that
the court erred in not applying the ratification finding to the fraud finding.





[34]  This
submission of the ratification issue is almost verbatim the instruction
contained in the Texas Pattern Jury Charges. 
Comm. on Pattern Jury Charges,
State Bar of Tex., Texas Pattern Jury Charges PJC 101.5 (2002).  The PJC in turn pulled much of the language
from Land Title Co. v. F.M. Stigler, Inc., 609 S.W.2d 754, 756-58 (Tex.
1980).  The concept of ratification has
many potential applications in various fields of law.  See, e.g., Fortune Prod. Co. v. Conoco,
Inc., 52 S.W.2d 671 (Tex. 2000) (discussing ratification in the context of
fraudulent inducement of a contract); Walker Ins. Servs. v. Bottle Rock
Power Corp., 108 S.W.3d 538, 552 n.9 (Tex. App.—Houston [14th Dist.] 2003,
no pet.) (discussing ratification of the acts of a stranger); Gen. Dynamics
v. Torres, 915 S.W.2d 45, 51 (Tex. App.—El Paso 1995, writ denied)
(discussing ratification that may occur when a corporate director or officer
benefits from a transaction with the corporation).  The Land Title case involved an agency
context and whether the principle ratified the agent’s conduct by retaining the
benefits of the transaction.  609 S.W.2d
at 756-58.  While we do not quibble with
the court’s application of the law under the circumstances of that case, it
appears to be a poor choice on which to base a general purpose ratification
submission.  In doing so, the Committee
on Pattern Jury Charges has essentially disregarded the comprehensive and
useful discussion of ratification contained in the Restatement of Agency and
other useful Texas law.  See generally
Disney Enters., Inc. v. Esprit Fin., Inc., 981 S.W.2d 25, 31 (Tex. App.—San
Antonio 1998, writ dim’d w.o.j.); Restatement
(Second) of Agency §§ 82-104, et al (1958).  A more useful, general purpose definition of
the legal concept of ratification can be found in these other sources, to wit: the adoption or confirmation by a
person with knowledge of all material facts of a prior act that did not then
legally bind him and that he had the right to repudiate.  Willis v. Donnelly, 118 S.W.3d 10, 26
(Tex. App.—Houston [14th Dist.] 2003, pet. filed); Samms v. Autumn Run Cmty.
Improvement Ass’n, 23 S.W.3d 398, 403 (Tex. App.—Houston [1st Dist.] 2000,
pet. denied); Disney Enters., 981 S.W.2d at 31; Restatement
(Second) of Agency §§ 82, 91.





[35]  Except for
making arguments that duplicate arguments made by Wu, Ng basically adopts Wu’s
arguments regarding ratification. 
Accordingly, we address ratification as it pertains to Ng and Wu
together.





[36]  Wu appears to
reduce “express” to mean “verbal” and “implied” to mean “nonverbal,” but he
offers no support for these definitions either generally or in this context.





[37]  The critical
factor in ratification cases is whether the allegedly ratifying party had full
knowledge at the time of the alleged ratification and what it did in light of
that knowledge.  Land Title Co.,
609 S.W.2d at 756.





[38]  There is
considerable disagreement in the briefing as to whether the monthly approval of
the Overdraft and Watch List reports constituted approval of the preparation
and form of the reports or the actions underlying the reports.  The evidence in the record is ambiguous on this
point.  Wu testified that the board
approved of the overdrafts, but he suggests in some places that this approval
came in the form of silence, and in others, he suggests there might have been a
formal vote, although he is unclear on any dates, and there is no such evidence
in the record.  TFNB contends that the
board did not make credit decisions unless the transaction involved a board
member and that the proper way for the executive committee to approve an overdraft
would have been for a request to be submitted to the committee and approved and
signed by the chairman; no such approval exists in the record.  Wu’s own expert witness testified
inconsistently on the issue of whether approval of the reports constituted
approval of the underlying actions, and Wu himself conceded that the listing of
loan delinquencies in the Watch List reports did not result in approval of
those delinquencies.





[39]  The executive
committee approved a consolidation loan for Alyna and a related “Lending Policy
Non-Compliance Justification Form.”  The
form was apparently necessary because the loan violated TFNB’s lending policy
in that it extended the maturity date and Alyna had not provided current
financial statements.  Nevertheless, Wu
asserts that, in approving the Form, the committee also approved the Alyna
overdrafts that the loan was intended to consolidate.  His only citation for this conclusion is to
testimony stating that, generally, if there was to be a policy exception, it
would first be discussed with the committee and approved or denied by
them.  This testimony says nothing about
what happened in regard to this particular Form.  Attached to the Form are loan documents,
including a worksheet that references that the loan was to allow Alyna to
restructure its “debts and overdrafts.” 
In approving the Form, it thus appears that the committee was simply
approving a loan that violated the lending policy.  There is no indication that such approval was
intended as approval of the prior overdrafts. 
Restructuring of an existing debt would not seem to ratify conduct that caused
the debt to begin with.  Cf. Vessels
v. Anshutz Corp., 823 S.W.2d 762, 764-66 (Tex. App.—Texarkana 1992, writ
denied) (holding that ratification of a subsequent agreement did not ratify
prior tortious conduct).  Ultimately, the
loan was never funded, apparently because Alyna’s debt grew out of control
before the loan could be funded.





[40]  The executive
orders were just a small portion of the evidence demonstrating that Wu usurped
Kramer’s authority.





[41]  Our citation
to Spangler in this limited context should not be read as an adoption of
TFNB’s argument that a breach of fiduciary duty can never be ratified.  Compare Spangler, 861 S.W.2d at 394-96, with Miller v. Kennedy
& Minshew, P.C., 142 S.W.3d 325,
344 n.53 (Tex. App.—Fort Worth 2003, pet. denied) (limiting Spangler to
its facts).  Because of our disposition
of this case, we need not address that particular assertion.





[42]  There was
evidence that the board and executive committee knew that Alyna was having
difficulty paying on its loans, that overdrafts were being given to Alyna in
excess of Ng’s authority to do so, that Alyna had been suspected of kiting in
August 1998 (although an investigation revealed no evidence of kiting at that time),
and that Alyna had been sued by FFP (the money order company).  There was also evidence that in February
1999, the board became aware that Alyna was again suspected of check kiting.  However, there was no evidence that: the
shareholders, board, or executive committee knew during the relevant time
period about the full nature of Alyna’s conduct regarding the money orders (e.g.,
that the money orders were not paid for and that many were made out to Alyna or
affiliated entities); the shareholders, board, or executive committee knew that
the provisional credit mentioned in the September Watch List was based in part
on the suspect money orders; or the board or committee knew that Ng had made
misrepresentations to them and had failed to disclose other material
information, that Wu had usurped Kramer’s authority and permitted Ng’s reckless
behavior regarding the Alyna accounts, or that Ng was giving overdrafts and
immediate credits to Alyna while Alyna was writing checks to affiliated
entities.  Wu and Ng base much of their
knowledge arguments on the monthly Overdraft and Watch List Reports received by
the board, but nothing in those reports for the relevant time periods indicated
any wrongdoing on behalf of Wu or Ng; thus, they constitute no evidence that
the board had knowledge of such wrongdoing.





[43]  In making
these statements, Wu stresses that Kramer and Tsao had information that they
did not convey to the board, but the statements appear equally applicable to
the information regarding Wu’s and Ng’s conduct.  There was evidence that the board and executive
committee would have acted very differently and probably would have shut down
the accounts if they had known the truth about the credit and Alyna’s misuse of
money orders.





[44]  At one point,
Wu suggests that the corporation viewed as an entire entity had full knowledge
because certain officers of the corporation had certain pieces of knowledge,
specifically Kramer, the CEO and president, and Tsao, the head cashier.  If adopted, Wu’s argument could swallow the
tort of breach of fiduciary duty whole. 
The only logical rule is that the person or body ratifying the conduct
must be the one with full knowledge; otherwise, someone who breaches his
fiduciary duty could simply tell one officer or director the truth about his
actions and then request approval from the board or the shareholders without
anyone else being informed about the true nature of his actions.  See Samms, 23 S.W.3d at 403 (defining
ratification as the
adoption or confirmation by a person with knowledge of all material facts of
a prior act that did not then legally bind him and that he had the right to
repudiate).  Accordingly, we find no merit in this argument
irrespective of whether Kramer and Tsao could collectively be held to have had
full knowledge of Ng’s or Wu’s conduct.





[45]  TFNB suggests
that silence could never express the level of intent required for
ratification.  However, several cases
have indicated that ratification can occur through a party’s silence when it
has full knowledge of the facts and its silence clearly indicates
affirmance.  See, e.g., Southwestern
Bell Tel. Co. v. Wilson, 768 S.W.2d 755, 764 (Tex. App.—Corpus Christi
1989, writ denied); Diamond Paint Co. v. Embry, 525 S.W.2d 529, 535
(Tex. App.—Houston [14th Dist.] 1975, writ ref’d n.r.e.).  Further, the Restatement supports the concept that silence
under circumstances where a principal would naturally be expected to speak if
it did not consent to an agent’s action is evidence on which consent can be
inferred.  Restatement (Second) of Agency § 94 & cmt a.





[46]  On remand, the
trial court should consider any applicable settlement credits and the
calculation of interest on the judgment. 
See Crown Life Ins. v. Casteel, 22 S.W.3d 378, 392 (Tex. 2000)
(remanding to the trial court for application of settlement credit).